**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**November 9, 2010**

**Elisabeth A. Shumaker**
**Clerk of Court**

<u>PUBLISH</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

_____

KAREN SAMPSON; NORMAN
FECK; LOUISE SCHILLER; TOM
SORG; WES CORNWELL; BECKY
CORNWELL,

      Plaintiffs - Appellants/
      Cross-Appellees,

   v.

BERNIE BUESCHER, in his official
capacity as Colorado Secretary of
State,

      Defendant - Appellee/
      Cross-Appellant.

_____

CENTER FOR COMPETITIVE
POLITICS; INDEPENDENCE
INSTITUTE; NATIONAL
TAXPAYERS UNION; SAM ADAMS
ALLIANCE; COLORADO COMMON
CAUSE, BRENNAN CENTER FOR
JUSTICE AT NYU SCHOOL OF
LAW,

      Amici Curiae.

Nos. 08-1389 and 08-1415

_____

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. NO. 1:06-CV-01858-RPM)**

_____

Steven M. Simpson (William H. Mellor, with him on the briefs), Institute for Justice, Arlington, Virginia, for Plaintiffs - Appellants/Cross-Appellees.

Monica M. Marquez, Assistant Solicitor General, (John W. Suthers, Attorney General, and Maurice G. Knaizer, Deputy Attorney General, with her on the briefs), Denver, Colorado, for Defendant - Appellee/Cross-Appellant.

Reid Alan Cox and Stephen M. Hoersting, Center for Competitive Politics, Alexandria, Virginia, filed an amicus curiae brief for Center for Competitive Politics, Independence Institute, National Taxpayers Union and, Sam Adams Alliance

J. Lee Gray, Holland & Hart LLP, Greenwood Village, Colorado, filed an amicus curiae brief for Colorado Common Cause.

Angela Migally, Monica Youn, and Laura MacCleery, Brennan Center for Justice, New York, New York, filed an amicus curiae brief for Brennan Center for Justice at NYU School of Law.

---

Before **BRISCOE**, Chief Circuit Judge, **MCKAY**, and **HARTZ**, Circuit Judges.

---

**HARTZ**, Circuit Judge.

---

There is nothing novel about requiring election campaign committees in this country to file periodic reports, including disclosures of names of contributors and the amount contributed. Many judicial decisions have considered whether particular reporting and disclosure requirements can withstand scrutiny under the First Amendment. The great bulk of those decisions, however, concern committees that are working for or against candidates for public office. Reporting requirements are justified as necessary to police whether anyone is contributing more than allowed to a candidate (the contribution limits

-2-

being justified, in turn, by the need to prevent quid pro quo corruption, and the appearance of corruption) and to give the electorate useful information concerning the candidate's views and those to whom the candidate is likely to be beholden.

At issue on this appeal is a different type of campaign committee, not one seeking to elect or defeat a candidate, but one seeking to prevail on a ballot initiative. A citizen voting on a ballot initiative is not concerned with the merit, including the corruptibility, of a person running for office, but with the merit of a proposed law or expenditure, such as a bond issue. As a result, the justifications for requiring disclosures in a candidate election may not apply, or may not apply with as much force, to a ballot initiative. Disclosure may facilitate ad hominem arguments - for whatever they are worth - on the merits of the ballot initiative; but there is no need for concern that contributors can change a law enacted through a ballot initiative as they can influence a person elected to office.

Colorado law requires that any group of two or more persons that has accepted or made contributions or expenditures exceeding $200 to support or oppose a ballot issue must register as an issue committee and report the names and addresses of anyone who contributes $20 or more. Plaintiffs are residents of Parker North, a neighborhood of about 300 homes in an unincorporated part of Douglas County, Colorado, who opposed the annexation of their neighborhood into the Town of Parker. Plaintiffs had raised less than $1,000 in monetary and in-

kind contributions for their cause when supporters of annexation challenged the failure of the opponents to register as an issue committee.

Plaintiffs contend that Colorado reporting requirements unconstitutionally burden their First Amendment right to association. We agree that Colorado law, as applied to Plaintiffs, has violated their constitutional freedom of association.. There is virtually no proper governmental interest in imposing disclosure requirements on ballot-initiative committees that raise and expend so little money, and that limited interest cannot justify the burden that those requirements impose on such a committee.

## I.       BACKGROUND

### A.       Colorado Law

The Colorado Constitution defines *issue committee* as:

any person, other than a natural person, or any group of two or more persons, including natural persons:  (I) [t]hat has a major purpose of supporting or opposing any ballot issue or ballot question; [and][1] (II) [t]hat has accepted or made contributions or expenditures in excess of two hundred dollars to support or oppose any ballot issue or ballot question.

---

[1]The statutory text uses "or," not "and."  Colo. Const. art. XXVIII, § 2(10)(a)(II).  But the Secretary of State has interpreted the provision by replacing "or" with "and".  *See* Secretary of State Rules Governing Campaign and Political Finance 1.7(b) ("A person or group of persons is an issue committee only if it meets both of the conditions in Article XXVIII, Section 2(10)(a)(I) and 2(10)(a)(II).");  *see* Aplt. Opening Br. at 10 (stating that both the major purpose *and* contribution-or-expenditure requirement must be met to create an issue committee); Amicus Br. of Brennan Center at 7 (same).  *But see* Aplee. Br. at 9 (quoting the statutory language using *or*).

Colo. Const. art. XXVIII, § 2(10)(a)(I)-(II).  All monetary contributions received by an issue committee must be deposited in a separate account in the committee's name; no contribution or expenditure exceeding $100 may be in cash.  *Id.* § 3(9), (10). The Colorado Fair Campaign Practices Act (the Campaign Act) requires an issue committee to register with the appropriate officer (usually the Secretary of State or County Clerk) before accepting contributions.  *See* Colo. Rev. Stat. § 1-45-108(3).  The statement of registration must include the name of the issue committee; the name of a registered agent; the committee's address and telephone number; the identities of all affiliated candidates and committees; and the "purpose or nature of interest" of the committee.  *Id.*

Issue committees also must report all contributions and expenditures, including the name and address of any person who contributes $20 or more, and the occupation and employer of any person who contributes $100 or more.  *See id.* § 1-45-108(1)(a)(I)-(II).  Reports required to be filed with the county clerk (such as the reports in this case, *see id.* § 1-45-109(1)) must be filed 21 days before the election, on the Friday before the election, and 30 days after the election; and annually in off-election years.  *See id.* § 1-45-108(2)(a)(II).  They must include the committee's fund balance at the beginning of the reporting period, the total amounts of contributions and expenditures during the reporting period, and the name and address of the financial institution used by the committee.  *See id.* § 1-45-108(2)(b).

The reports are public records and are made available on the Secretary of State's website. *See id.* § 1-45-109(4)–(5). Failure to comply with the registration and reporting requirements can result in civil penalties "of fifty dollars per day for each day that a statement or other information required to be filed [by the Constitution or the Campaign Act] is not filed by the close of business on the day due," Colo. Const. art. XXVIII, § 10(2)(a), although the Secretary or an administrative law judge (ALJ) can set aside or reduce a penalty upon a showing of good cause. *See id.* § 10(2)(b), (c).

The Campaign Act directs the Secretary of State to "promulgate such rules . . . as may be necessary to enforce and administer any provision of [the Act]." Colo. Rev. Stat. § 1-45-111.5. The rules are 19 pages long. Among other things, the rules require that each contribution or expenditure of $20 or more be listed separately, *see* 8 CCR 1505-6 §§ 4.1, 4.4, and that any change in the information disclosed in the registration form be reported within five days, *see id.* § 3.1. The Secretary also publishes the Colorado Campaign and Political Finance Manual, which has 41 pages of text and another 51 pages of appendices that reproduce the applicable constitutional, statutory, and regulatory provisions. The Secretary's website acknowledges that "[t]he laws and rules governing campaign finances are complex." Aplt. App., Vol. II at 750. The Manual states that it "provides guidelines and helpful tips for proper compliance with the law." *Id.* at 585. But it is to be used "for reference and training purposes only and should not be used

-6-

as a substitute for legal advice." *Id.* (full capitalization omitted). Indeed, if the Secretary cannot answer a question, he recommends retaining an attorney. *See id.* at 763, 765 (deposition of Christi Heppard, head of the campaign-finance department of Secretary's office).

Private citizens can enforce these provisions by filing with the Secretary of State a written complaint alleging a violation of the registration or reporting requirements. *See* Colo. Const. art. XXVIII, § 9(2)(a). Within three days of filing, the Secretary must refer the complaint to an ALJ who "shall hold a hearing within fifteen days of the referral of the complaint, and shall render a decision within fifteen days of the hearing." *Id.* If the ALJ determines that a violation occurred, the judge's decision "shall include any appropriate order, sanction, or relief authorized" under Article XXVIII of the state constitution. *Id.* Further, a party in such a proceeding may be entitled to recover its attorney fees from an opposing attorney or party who brought or defended an action without "substantial justification." Colo. Rev. Stat. § 1-45-111.5(2). The ALJ's decision "shall be final and subject to review by the [Colorado] court of appeals." Colo. Const. art. XXVIII, § 9(2)(a). The Secretary can enforce the decision; but if the Secretary does not file an enforcement action within 30 days of the decision, the private complainant may institute a private action for enforcement. *See id.* "The prevailing party in a private enforcement action shall be entitled to reasonable attorneys fees and costs." *Id.*

-7-

**B.** **The Parker North Annexation**

In 2005, Parker North resident David Hopkins began to gather signatures for a petition seeking the annexation of Parker North into the Town of Parker, Colorado. He submitted the petition with the necessary signatures to the Parker Town Council at a meeting on February 21, 2006. After the meeting Plaintiff Norman Feck wrote a letter to Parker's mayor and council opposing annexation and distributed a copy of his letter to every household in Parker North. Plaintiffs Karen Sampson and Tom Sorg later met with Feck and several other neighbors, and joined Feck's efforts. Sorg discovered that residents could remove their signatures from Hopkins's annexation petition and encouraged neighbors to do so. He also started an e-mail discussion group for all Parker North residents to debate annexation. Several Plaintiffs walked the neighborhood to discuss annexation with residents, wrote letters, and developed flyers that they distributed. Plaintiff Wes Cornwell owned a printing shop and printed "No Annexation" signs which he sold to Parker North residents at cost. On March 23 the Parker Town Council declared Hopkins's petition invalid because a sufficient number of residents of Parker North had withdrawn their signatures.

In April 2006, Hopkins and Patsy Putnam circulated a second petition to hold an annexation election, this time without language allowing residents to remove their signatures. Plaintiffs again began efforts to oppose the petition. About this time Hopkins learned of the campaign finance laws governing issue

committees and registered the issue committee "Parker Yes" online on May 9, 2006.

To persuade their neighbors to oppose annexation, Plaintiffs purchased and distributed No Annexation signs, mailed to all residents of Parker North a postcard summarizing the reasons to oppose annexation, continued to discuss and debate the issue on the Internet, and on June 16 submitted to the Town Council a document opposing annexation that was signed by 215 residents. Putnam and Hopkins engaged in similar efforts to promote their side of the issue. On June 19 the Town Council scheduled a meeting for August 14 to decide whether to hold an annexation election. At that later meeting, it voted to hold the election on February 6, 2007. The proposed annexation was defeated 351 to 21.

## C.    The Campaign-Law Complaint

On July 3, 2006, Putnam, with Hopkins as her attorney, filed a complaint with the Secretary of State alleging that Plaintiffs had violated the campaign finance law by failing (1) to register as an issue committee, (2) to establish a committee bank account with a separate tax identification number, and (3) to comply with the reporting requirements of Colorado Law. Among the allegations was that Plaintiffs' "illegal activities . . . expos[e] all persons who have contacted or obtained campaign materials from [Plaintiffs] with possible investigation, scrutinization and sanctions for Campaign Finance violations." Aplt. App., Vol. II at 582.

The Secretary referred the complaint to Colorado's Office of Administrative Courts.  Plaintiffs obtained counsel and on counsel's advice, Plaintiff Becky Cornwell registered the issue committee "No Annexation" on July 16, listing herself as the registered agent.  The report, covering November 27, 2005, to July 13, 2006, showed nonmonetary contributions (signs, a banner, postcards, and postage) totaling $782.02 from Plaintiffs Sampson, Feck, and Wes Cornwell.[2]

On July 12, Putnam followed her complaint with a subpoena to produce the following:

> [1]  All evidence of sales, purchases, gifts or any transfers of any materials concerning annexation of Parker North into the Town of Parker, Colorado, including signs, banners or campaign materials,

[2]The registration and report may have been premature.  In district court both parties agreed that under then-current law the registration requirement had arisen by the time the first petition for annexation was presented to the Town Council.  But the district court rejected that interpretation, holding that the registration and reporting requirements were not triggered until the municipality published the notice of election, which did not occur until December 24, 2006. *See Sampson v. Coffman*, No. 06-cv-01858-RPM, 2008 WL 4305921, at *8 (D. Colo. Sept. 18, 2008) (unpublished).  After that decision the Campaign Act was amended to state that a municipal-annexation matter does not become a ballot issue until the first notice of the annexation election is published. *See* Colo. Rev. Stat. § 1-45-108(7)(b); *id.* § 31-12-112(6).  Although Plaintiffs' opening brief on appeal contends that the district court erred in interpreting the preamendment law, the amendment has mooted the issue; Plaintiffs do not argue that they could obtain any relief were we to decide that the district court misinterpreted the statute before its amendment. *See Kansas Judicial Review v. Stout*, 562 F.3d 1240, 1246 (10th Cir. 2009) ("Generally, repeal of a challenged statute causes a case to become moot because it extinguishes the plaintiff's legally cognizable interest in the outcome, rendering any remedial action by the court ineffectual.")

showing the item, the amount contributed or expended, the fair market value of each such item and whether it was sold, gifted or otherwise transferred, listing the type of transfer.

[2] Names, addresses and telephone numbers for all persons who are or may be members of [Plaintiffs'] issue committee or group.

[3] Names, addresses and telephone numbers for all persons sold, gifted, or transferred signs, banners or any campaign information.

[4] All evidence concerning amounts contributed and expended on the issue of annexation of Parker North into the Town of Parker, Colorado.

[5] All bank account information concerning contributions, expenditures or campaign materials on the issue of annexation of Parker North into the Town of Parker, Colorado.

[6] All issue committee registration information concerning the issue of annexation of Parker North into the Town of Parker, Colorado.

[7] All reports made or due to any entity, including the Colorado Secretary of State, concerning the issue committee of [Plaintiffs] or about the issue of annexation of Parker North into the Town of Parker, Colorado.

[8] All communications amongst [Plaintiffs] or anyone else concerning the issue of annexation of Parker North into the Town of Parker, Colorado.

[9] Examples of information or campaign materials sold, gifted or transferred to anyone concerning the issue of annexation of Parker North into the Town of Parker, Colorado.

*Id.* at 603.

Plaintiffs objected to producing the information. But in a written ruling on August 30, the ALJ refused to quash the subpoena except (1) he limited paragraph [2] to include only the names and addresses of all committee members and the identities of all other persons or organizations "that have participated with [Plaintiffs] in opposing the annexation in question in any significant way"; (2) he

quashed the request for materials described in paragraph [3]; (3) he said that [Plaintiffs] need not produce material described in paragraphs [4], [5], [6], and [7] that was available on the Secretary of State's website; and (4) he limited the production of materials described in paragraph [8] to "all communications amongst [Plaintiffs] and any member of the issue committee [and] . . . persons who have opposed the annexation in a significant way." *Id.*, Vol. IV at 1418–19.

In the meantime, on July 21, Putnam, through her lawyer Hopkins, sent Plaintiffs a letter with a "non-negotiable offer of settlement." *Id.*, Vol. II at 608. Under the "Stipulation and Guilty Plea" enclosed with the letter, Plaintiffs would admit all charges against them and would either abandon their organized opposition to the annexation (including removing all signs and campaign material) or follow all laws governing issue committees. The letter gave Plaintiffs four days to respond.

Plaintiffs did not sign the agreement and a hearing was held before the ALJ on September 20. All Plaintiffs took off from work to attend. After several hours of testimony by Putnam, the parties reached a settlement. It stipulated (1) that assuming, for purposes of the stipulation, that there was a ballot issue on or before June 2, 2006, Plaintiffs met the state constitutional definition of an issue committee on that date, and (2) that no fines, attorney fees, or other sanction would be imposed against any party or the attorneys.

## D. Plaintiffs' Lawsuit

-12-

On September 19, 2006, the day before entering into the stipulation in the administrative proceeding, Plaintiffs filed suit under 42 U.S.C. § 1983 in the United States District Court for the District of Colorado. Their three-count complaint alleged that the Colorado law regulating ballot-issue committees violated the First Amendment because (1) the private-enforcement provision unconstitutionally chills free speech; (2) the registration and disclosure requirements unconstitutionally burden the constitutional rights to free speech and association; and (3) the disclosure requirements violate the right to anonymous speech and association. Plaintiffs requested (1) a declaration that the private-enforcement provision is facially unconstitutional; (2) a declaration that the registration and disclosure requirements are unconstitutional, facially, and as applied; and (3) a preliminary and permanent injunction against the Secretary, prohibiting enforcement. Plaintiffs also requested attorney fees and costs.

On September 18, 2008, the district court issued its decision on the parties' cross motions for summary judgment. *See Sampson v. Coffman*, No. 06-cv-01858-RPM, 2008 WL 4305921 (D. Colo. Sept. 18, 2008) (unpublished). Contrary to the parties' contentions that the challenged campaign finance laws became applicable when the petition for annexation received its first signature, the court concluded that the challenged campaign finance laws did not apply to Plaintiffs until the Town first published notice of the annexation election on December 14, 2006. *See id.* at *21. It upheld the constitutionality of the

-13-

challenged provisions as applied to Plaintiffs after that date, although it stated that application of the law to Plaintiffs' activities before that date would have been unconstitutional. It declined to rule on Plaintiffs' challenge to the private-enforcement process because the administrative proceedings had terminated in a settlement. It did, however, award attorney fees to Plaintiffs under 42 U.S.C. § 1988.

On appeal Plaintiffs raise the arguments that they presented to the district court. We agree with their as-applied First Amendment argument, holding that the Colorado registration and reporting requirements have unconstitutionally burdened their First Amendment right of association. Because of that ruling, we need not address their other contentions. The Secretary has cross-appealed, arguing that the attorney-fee award was improper because Plaintiffs failed to obtain any of the judicial relief requested in their complaint. But that argument is mooted by our disposition of Plaintiffs' appeal, so we affirm the attorney-fee award.

## II. DISCUSSION

It is unlikely that the Colorado voters who approved the disclosure requirements of Article XXVIII of the state's Constitution were thinking of the No Annexation committee. The language of the Article's preamble relevant to ballot-issue campaigns explains its purpose as follows:

> The people of the state of Colorado hereby find and declare . . . that *large campaign contributions* made to influence election outcomes *allow wealthy individuals, corporations, and special interest groups to exercise a disproportionate level of influence over the political process*; . . . that political contributions from corporate treasuries are not an indication of popular support for the corporation's political ideas *and can unfairly influence the outcome of Colorado elections*; and that the interests of the public are best served by . . . providing for full and timely disclosure of campaign contributions, independent expenditures, and funding of electioneering communications, and strong enforcement of campaign finance requirements.

Colo. Const. art. XXVIII, § 1 (emphasis added). It would take a mighty effort to characterize the No Annexation committee's expenditure of $782.02 for signs, a banner, postcards, and postage as an exercise of a "disproportionate level of influence over the political process" by a wealthy group that could "unfairly influence the outcome" of an election. *Id.* The disconnect between the avowed purpose of the constitutional disclosure requirements and their effect in this case should in itself provoke doubt about whether the burden on the First Amendment associational rights of the members of the No Annexation committee could be justified. And, as we shall proceed to explain, an examination of First Amendment doctrine confirms that doubt.

## A. The Right to Associate and Disclosure Requirements

Without question, Colorado election laws place burdens on the right to associate to support or oppose ballot issues. The Colorado Constitution restricts the meaning of *issue committee* to "any person, other than a natural person, or any group of two or more persons, including natural persons." *Id.* § 2(10)(a). In

-15-

other words, a single natural person is not subject to the disclosure or reporting requirements imposed on ballot-issue organizations such as the No Annexation committee. (Individuals who expend more than $1000 on electioneering communications within a year or make an independent expenditure exceeding $1000 to support or oppose a candidate are required to make disclosures, *see id.* §§ 5(1), 6(1); but those requirements do not apply to expenditures for ballot issues, *see id.* § 2(7) (defining *electioneering communication*).) In *Citizens Against Rent Control/Coalition for Fair Housing v. City of Berkeley*, 454 U.S. 290, 296 (1981), the Supreme Court held that a city ordinance burdened freedom of association because an affluent person was subject to no limits on spending to support a ballot measure, but contributions made in concert with others were so restricted. The Court said: "There are, of course, some activities, legal if engaged in by one, yet illegal if performed in concert with others, but political expression is not one of them." *Id.*

Reporting and disclosure requirements, just as the limits on contributions in *City of Berkeley*, can infringe on the right of association. *See Buckley v. Valeo*, 424 U.S. 1, 64 (1976). As stated by Justice Brennan for a plurality in *Federal Election Commission v. Massachusetts Citizens for Life*, 479 U.S. 238, 254 (1986), "Detailed record-keeping and disclosure obligations, along with the duty to appoint a treasurer and custodian of records, impose administrative costs that many small entities may be unable to bear." *See Citizens United v. Fed. Election*

-16-

*Comm'n*, 130 S. Ct. 876, 897–98 (2010) (because of the burdens imposed on PACs, contributing through a PAC is an inadequate substitute for direct contributions by the corporation itself); *Colo. Right To Life Comm., Inc. v. Coffman*, 498 F.3d 1137, 1145 n.6 (10th Cir. 2007) (Colorado constitutional provision "requiring corporations to make independent expenditures only through segregated funds . . . burdens corporate freedom of expression").

Nevertheless, not all burdens on freedom of association are unconstitutional. In particular, "disclosure requirements in the electoral context" may be upheld if they survive "'exacting scrutiny.'" *Doe v. Reed*, 130 S. Ct. 2811, 2818 (2010). "That standard requires a substantial relation between the disclosure requirement and a sufficiently important governmental interest. To withstand this scrutiny, the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights." *Id.* (citation and internal quotation marks omitted). "In determining whether these [governmental] interests are sufficient to justify the requirements we must look to the extent of the burden that they place on individual rights." *Valeo*, 424 U.S. at 68.

When analyzing the governmental interest in disclosure requirements, it is essential to keep in mind that our concern is with ballot issues, not candidates. The legitimate reasons for regulating candidate campaigns apply only partially (or perhaps not at all) to ballot-issue campaigns. For example, the Supreme Court has upheld limits on contributions to candidates on the ground that the limits are

necessary to avoid the risk or appearance of quid pro quo corruption—the exchange of a contribution for political favor. *See Citizens United*, 130 S. Ct. at 901–02; *Valeo*, 424 U.S. at 45–48 (limits on independent expenditures are unconstitutional because "[t]he absence of prearrangement and coordination of an expenditure with the candidate or his agent not only undermines the value of the expenditure to the candidate, but also alleviates the danger that expenditures will be given as a quid pro quo for improper commitments from the candidate"). Limits on contributions to ballot-issue committees, in contrast, are unconstitutional because of the absence of any risk of quid pro quo corruption. *See McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 352 n.15 (1995)*; City of Berkeley*, 454 U.S. at 296–300; *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 790 (1978) ("The risk of corruption perceived in cases involving candidate elections . . . simply is not present in a popular vote on a public issue."); *cf. Elam Constr. v. Reg'l Transp. Dist.*, 129 F.3d 1343 (10th Cir. 1997) (invalidating resolution of transportation-district governing body that district would not enter into contracts with companies that have contributed more than $100 to referendum campaigns).[3]

---

[3]The amicus brief of the Brennan Center for Justice makes interesting arguments that corruption concerns can arise in ballot-issue campaigns that are associated with candidate elections. But we need not address the arguments because they are irrelevant to our disposition of this case and were not raised by any party to the appeal. *See Harris v. Owens*, 264 F.3d 1282, 1288 n.3 (10th Cir. 2001) (court does not ordinarily address issues raised only by amici).

As for disclosure requirements specifically, the Supreme Court has recognized three proper justifications for reporting and disclosing campaign finances. The first is that reporting and disclosure requirements "are an essential means of gathering the data necessary to detect violations of . . . contribution limitations." *Valeo*, 424 U.S. at 68. The second is that publicizing large contributions and expenditures can "deter actual corruption and avoid the appearance of corruption" and can facilitate detection of post-election favoritism. *Id.* at 67. The third justification is an informational interest. Disclosure of contributions and expenditures:

> allows voters to place each candidate in the political spectrum more precisely than is often possible solely on the basis of party labels and campaign speeches. The sources of the candidate's financial support also alert the voter to the interests to which a candidate is most likely to be responsive and thus facilitates predictions of future performance in office.

*Id.*[4]

The first and second grounds do not support reporting and disclosure requirements for ballot-issue committees. The first—facilitating the detection of violations of contribution limitations—is mooted by the prohibition on

_____

[4]The Secretary of State's appellate brief also cites to *United States v. Harriss*, 347 U.S. 612, 625 (1954), which rejected a First Amendment challenge to disclosure requirements for Congressional lobbyists. In *McIntyre* the Supreme Court distinguished *Harriss* on the ground that "[t]he activities of lobbyists who have direct access to elected representatives, if undisclosed, may well present the appearance of corruption." 514 U.S. at 356 n.20. In our view, *Harriss* teaches little about disclosure requirements in ballot-issue campaigns to influence *public* opinion.

contribution limitations in the ballot-issue context.  And the second—deterring

corruption and its appearance—is irrelevant because, as our prior discussion has

pointed out, quid pro quo corruption cannot arise in a ballot-issue campaign.  *See*

*Buckley v. Am. Constitutional Law Found., Inc.* (*ACLF*), 525 U.S. 182, 203–04

(1999); *McIntyre v. Ohio Election Comm'n*, 514 U.S. 334, 352 n.15; *City of*

*Berkeley*, 454 U.S. at 296–97; *Bellotti*, 435 U.S. at 790.

Thus, the reporting and disclosure requirements for Colorado issue

committees (at least those committees addressing ballot issues) must be justified

on the third ground—the informational interest.  We must therefore analyze the

public interest in knowing who is spending and receiving money to support or

oppose a ballot issue.  It is not obvious that there is such a public interest.

Candidate elections are, by definition, ad hominem affairs.  The voter must

evaluate a human being, deciding what the candidate's personal beliefs are and

what influences are likely to be brought to bear when he or she must decide on

the advisability of future governmental action.  The identities of those with strong

financial ties to the candidate are important data in that evaluation.  In contrast,

when a ballot issue is before the voter, the choice is whether to approve or

disapprove of discrete governmental action, such as annexing territory, floating a

bond, or amending a statute.  No human being is being evaluated.  When many

complain about the deterioration of public discourse—in particular, the inability

or unwillingness of citizens to listen to proposals made by particular people or by

members of particular groups—one could wonder about the utility of ad hominem arguments in evaluating ballot issues. Nondisclosure could require the debate to actually be about the merits of the proposition on the ballot. Indeed, the Supreme Court has recognized that "[a]nonymity . . . provides a way for a writer who may be personally unpopular to ensure that readers will not prejudge her message simply because they do not like its proponent." *McIntyre*, 514 U.S. at 342.

The Supreme Court has sent a mixed message regarding the value of financial disclosure in a ballot-issue campaign. Perhaps its view can be summarized as "such disclosure has some value, but not that much." Although the Court has never rejected a First Amendment challenge to a financial-disclosure requirement in the ballot-issue context, on three occasions it has spoken favorably of such requirements.

First, in *Bellotti* the Court invalidated a Massachusetts statute prohibiting corporate expenditures in ballot-issue campaigns. 435 U.S. at 767. As previously noted, the Court stated that the risk of quid pro quo corruption is not present in such campaigns, *id.* at 790, and it observed that the voters "are entrusted with the responsibility for judging and evaluating the relative merits of conflicting arguments." *Id.* at 791. But it went on to say that the people "may consider, in making their judgment, the source and credibility of the advocate," *id.* at 791–92, and appended a footnote saying that "[i]dentification of the source of advertising

may be required as a means of disclosure, so that people will be able to evaluate the arguments to which they are being subjected," *id.* at 792 n.32.

Second, in *City of Berkeley* the Court similarly invalidated a municipal ordinance setting a cap on contributions to committees supporting or opposing ballot measures. *See* 454 U.S. at 291–94. In response to the City's argument that the contribution cap was necessary to identify those supporting or opposing a ballot measure, the Court said that the cap was not necessary because another provision in the ordinance required disclosure. The Court wrote, "The integrity of the political system will be adequately protected if contributors are identified in a public filing revealing the amounts contributed; if it is thought wise, legislation can outlaw anonymous contributions." *Id.* at 299–300.

More recently, in *ACLF* the Court expressed approval for disclosure requirements when it struck several provisions in a Colorado statute regulating the circulation of petitions to place initiatives on the ballot. 525 U.S. at 202–03. One issue before the Court was a statutory requirement to disclose the names of paid circulators and the amounts paid to each circulator. The Court, without distinguishing between candidate and ballot-issue campaigns, wrote:

> We explained in *Buckley* that disclosure provides the electorate with information as to where political campaign money comes from and how it is spent, thereby aiding electors in evaluating those who seek their vote. We further observed that disclosure requirements deter actual corruption and avoid the appearance of corruption by exposing large contributions and expenditures to the light of publicity. . . . [T]he State and supporting *amici* stress the importance of disclosure

-22-

as a control or check on domination of the initiative process by affluent special interest groups. . . . Disclosure of the names of initiative sponsors, and of the amounts they have spent gathering support for their initiatives, responds to that substantial state interest. . . . Through the disclosure requirements that remain in place, voters are informed of the source and amount of money spent by proponents to get a measure on the ballot; in other words, voters will be told who has proposed a measure, and who has provided funds for its circulation.

*Id.* (citations, brackets and internal quotation marks omitted). The Court also wrote: "To inform the public 'where [the] money comes from,' *Buckley*, 424 U.S. at 66 (internal quotation marks omitted), we reiterate, the State legitimately requires sponsors of ballot initiatives to disclose who pays petition circulators, and how much." *Id.* at 205. The disclosure requirements referred to in these passages, however, were not challenged in the case before the Court. The disclosure requirements that *were* challenged—the disclosure of the names of paid circulators and the amounts paid to each—were stricken because they could not be justified by the benefit they might add to the unchallenged disclosure requirements. *See id.* at 202–03.

Thus, in all three cases the statements by the Supreme Court supporting disclosures in ballot-issue campaigns were dicta. The Court has never upheld a disclosure provision for ballot-issue campaigns that has been presented to it for review. Of course, this court takes Supreme Court dictum very seriously. *United States v. Serawop*, 505 F.3d 1112, 1122 (10th Cir. 2007) ("we are bound by Supreme Court dicta almost as firmly as by the Court's outright holdings"

-23-

(internal quotation marks omitted)).  But the absence of the precise and careful analysis necessary to resolve a particular issue fully presented to the Court makes it difficult for us to assess the weight that should be granted the public interest in disclosure when balancing it against the burden on the First Amendment right of association imposed by a particular statute in a particular circumstance.  The difficulty is especially great when the Court has also suggested the limits of the public interest in disclosure in the ballot-issue context.  In *McIntyre* the Court meticulously distinguished its precedents affirming disclosure requirements in candidate elections as it overturned a fine for distributing anonymous pamphlets opposing a school tax levy.  *See* 514 U.S. at 353–56.  And it quoted the following passage from a New York court that struck down a similar statute:

> Of course, the identity of the source is helpful in evaluating ideas.
> But the best test of truth is the power of the thought to get itself
> accepted in the competition of the market.  Don't underestimate the
> common man.  People are intelligent enough to evaluate the source
> of an anonymous writing.  They can see it is anonymous.  They know
> it is anonymous.  They can evaluate its anonymity along with its
> message, as long as they are permitted, as they must be, to read that
> message.  And then, once they have done so, it is for them to decide
> what is responsible, what is valuable, and what is truth.

*Id.* at 348 n.11 (citation and internal quotation marks omitted); *cf. Bellotti*, 435 U.S. at 777 ("The inherent worth of the speech in terms of its capacity for informing the public does not depend upon the identity of its source, whether corporation, association, union, or individual.")

We also find it significant that in the recent decision in *Doe v. Reed*, 130 S. Ct. 2811, the Court affirmed a state law requiring disclosure of referendum petitions without reliance on the State's asserted interest in providing information to the electorate about who supports the petition. *See id.* at 2819. Rather, the court relied on the utility of disclosure in preserving the integrity of the electoral process. *See id.* at 2819–21. The concurring opinion of Justice Alito pointed out the "breathtaking" implications of the State's contention

> that publicly disclosing the names and addresses of referendum signatories provides the voting public with 'insight into whether support for holding a vote comes predominantly from particular interest groups, political or religious organizations, or other group[s] of citizens,' and thus allows voters to draw inferences about whether they should support or oppose the referendum.

*Id.* at 2824 (quoting Brief for Respondent Washington Families Standing Together 58). He continued:

> Were we to accept respondents' asserted informational interest, the State would be free to require petition signers to disclose all kinds of demographic information, including the signer's race, religion, political affiliation, sexual orientation, ethnic background, and interest-group memberships. Requiring such disclosures, however, runs headfirst into a half-century of our case law, which firmly establishes that individuals have a right to privacy of belief and association.

*Id.*

To be sure, typical financial-disclosure laws are not nearly as sweeping as the types of requirements hypothesized by Justice Alito. They require disclosure of only name and address, and sometimes employment. But by the same token,

-25-

they reveal only one dimension of the support for a ballot measure. Their purpose is not to inform the electorate about all who believe that a particular result is in the public interest; volunteers who devote many hours to grassroots work need not be identified. Rather, their only purpose is to identify those who (presumably) have a financial interest in the outcome of the election. See *Canyon Ferry Baptist Church v. Unsworth*, 556 F.3d 1021, 1033 (9th Cir. 2009) ("[T]he relevant informational goal is to inform voters as to who backs or opposes a given initiative financially, so that the voters will have a pretty good idea of who stands to benefit from the legislation." (internal quotation marks omitted)). This limited purpose must be kept in mind when evaluating the constitutionality of a particular financial-disclosure requirement.

Accordingly, while assuming that there is a legitimate public interest in financial disclosure from campaign organizations, we also recognize that this interest is significantly attenuated when the organization is concerned with only a single ballot issue and when the contributions and expenditures are slight. We now proceed to weigh that interest against the First Amendment right of association in the context of this case.

## B. Application to this Case

In our view, the burden on Plaintiffs' right to association imposed by Colorado's registration and reporting requirements cannot be justified by a public interest in disclosure. The burdens are substantial. The average citizen cannot be

expected to master on his or her own the many campaign financial-disclosure requirements set forth in Colorado's constitution, the Campaign Act, and the Secretary of State's Rules Concerning Campaign and Political Finance. Even if those rules that apply to issue committees may be few, one would have to sift through them all to determine which apply. As the Supreme Court recently observed in rejecting a proposed intricate interpretation of the term *electioneering communication* in 2 U.S.C. § 441b: "Prolix laws chill speech for the same reason that vague laws chill speech: People of common intelligence must necessarily guess at the law's meaning and differ as to its application." *Citizens United*, 130 S. Ct. at 889 (brackets and internal quotation marks omitted). The Secretary of State's website acknowledged that the State's campaign finance laws and rules "are complex," Aplt. App., Vol. II at 750, and the official who oversaw the Secretary of State's campaign finance department testified that she advises those with difficult questions to retain an attorney. And even attorneys are not error-free. Recall that the complaint filed by attorney Hawkins with the Secretary of State incorrectly alleged that persons who had obtained campaign materials from Plaintiffs could be subject to sanctions under Colorado law. Moreover, failure to comply with the rules can be expensive; failure to meet a recording deadline can cost $50 a day, *see* Colo. Const. art. XXVIII, § 10(2)(a). As Plaintiff Becky Cornwell stated in her affidavit:

I found the [campaign] laws difficult to understand and I constantly worried about being sued for even the smallest error. Particular points—like non-monetary contributions—were counterintuitive; the forms were hard to follow; the website was often slow and had technical glitches; and getting questions answered often took several days and sometimes did not yield correct answers or even any answer at all.

Aplt. App., Vol II t 490.

It is no surprise that Plaintiffs felt the need to hire counsel upon receiving the complaint against them filed with the Secretary of State. One would expect, as was the case here,[5] that an attorney's fee would be comparable to, if not exceed, the $782.02 that had been contributed by that time to the anti-annexation effort. This is a substantial burden. *See Citizens United*, 130 S. Ct. at 889 ("The First Amendment does not permit laws that force speakers to retain a campaign finance attorney, conduct demographic marketing research, or seek declaratory rulings before discussing the most salient political issues of our day."). And added to that burden was the burden on Plaintiffs of time, energy, and money to review the law themselves and to take off work to attend the hearing on the complaint against them.

---

[5]The record contains the No Annexation disclosure reports from November 27, 2005, through October 27, 2007. In addition to the $782.02 in in-kind contributions reported on July 13, 2006, the committee received an additional in-kind contribution of $31.53 in October 2006. The cash contributions (made between September 2006 and April 2007) totaled $1,426, of which $1,178.82 went for attorney fees and $247.18 remained in the committee bank account. *See* Aplt. App., Vol. I at 332–63.

On the other side of the scale, the public interest in disclosure is minimal. We agree with the Ninth Circuit that "[a]s a matter of common sense, the value of this *financial* information to the voters declines drastically as the value of the expenditure or contribution sinks to a negligible level." *Canyon Ferry Baptist Church*, 556 F.3d at 1033. *Canyon Ferry* considered a Montana statute requiring "political committees" to disclose expenditures and contributions. The term *political committee* encompassed any organization of two or more individuals who made contributions or expenditures with respect to a ballot issue. The court held the statute unconstitutional as applied to a one-time in-kind *de minimis* expenditure. *See id.* at 1031.

The expenditures in this case are more substantial than those in *Canyon Ferry*. But they are sufficiently small that they say little about the contributors' views of their financial interest in the annexation issue. One can question the value to the electorate of knowing that the contributors to Plaintiffs' committee might think that they will financially benefit from defeat of the annexation by more than the amount of their contributions. It is worth repeating the pertinent portions of §1 of the Colorado constitutional amendment governing campaign finances:

> The people of the state of Colorado hereby find and declare . . . that *large campaign contributions* made to influence election outcomes *allow wealthy individuals, corporations, and special interest groups to exercise a disproportionate level of influence over the political process* . . . that political contributions from corporate treasuries are

> not an indication of popular support for the corporation's political ideas *and can unfairly influence the outcome of Colorado elections*; and that the interests of the public are best served by . . . providing for full and timely disclosure of campaign contributions, independent expenditures, and funding of electioneering communications, and strong enforcement of campaign finance requirements.

Colo. Const. art. XXVIII, § 1 (emphasis added). Those expressed purposes have little to do with a group of individuals who have together spent less than $1,000 on a campaign (not including $1,179 for attorney fees); and the appellate briefs opposing Plaintiffs' position make no effort to explain the public interest in disclosure in this particular case

As stated above, campaign-disclosure statutes must survive exacting scrutiny. There must be a "substantial relation" between the requirement and a governmental interest that is sufficiently important to justify the burden on the freedom of association. See *Doe v. Reed*, 130 S. Ct. at 2818; *Valeo*, 424 U.S. at 64. Here, the financial burden of state regulation on Plaintiffs' freedom of association approaches or exceeds the value of their financial contributions to their political effort; and the governmental interest in imposing those regulations is minimal, if not nonexistent, in light of the small size of the contributions. We therefore hold that it was unconstitutional to impose that burden on Plaintiffs. We do not attempt to draw a bright line below which a ballot-issue committee cannot be required to report contributions and expenditures. The case before us is quite unlike ones involving the expenditure of tens of millions of dollars on ballot

issues presenting "complex policy proposals." *Cal. Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1105 (9th Cir. 2003). We say only that Plaintiffs' contributions and expenditures are well below the line.

## III.  CONCLUSION

We REVERSE and REMAND for entry of judgment in favor of Plaintiffs. We AFFIRM the award of attorney fees to Plaintiffs. We DENY as moot Plaintiffs' motion to supplement the record.