MELLOY, Circuit Judge,
with whom MURPHY, BYE and SMITH, Circuit Judges, join, concurring and dissenting.
I concur in Section II.C. of the majority opinion. I agree that Minnesota’s ban on corporate political contributions is likely constitutional. However, I dissent as to the analysis of Minnesota’s reporting requirements. I believe the majority fails to fully apply the holding of Citizens United, 130 S.Ct. at 913-14. Citizens United extensively discussed and relied upon two fundamental principles. First, corporations have a First Amendment right to speak through political contributions, id., 130 S.Ct. at 913, and second, the voting public has a right to know where the money is coming from, id. at 914. In my view, the majority gives short shrift to this second fundamental principle of Citizens United. Failure to honor this important public interest leads it to hold that the carefully crafted Minnesota disclosure legislation is likely to be unconstitutional.
I would first note that the majority opinion cites, but fails to apply, our controlling precedent on the standard to be applied in enjoining a duly enacted state statute. The majority cites the standard we articulated in Planned Parenthood of Minnesota, North Dakota, South Dakota v. Rounds, that to succeed on a preliminary injunction, a party must show that it “is likely to prevail on, the merits.” 530 F.3d 724, 730 (8th Cir.2008) (en banc). However, in my view, the majority ignores the reason we require this more rigorous standard “where a preliminary injunction of a duly enacted state statute is-sought.” Id. at 730. In imposing a higher standard in these cases, we seek to “ ‘reflect! ] the idea that governmental policies implemented through legislation or regulations developed through presumptively reasoned democratic processes are entitled to a higher degree of deference and should not be enjoined lightly.’ ” Id. at 732 (quoting Able v. United States, 44 F.3d 128, 131 (2d Cir.1995) (per curiam)). In my view, that is particularly true in cases such as this where we consider whether to enjoin a statute in which the state legislature exercised its legislative function of “line drawing.” Instead of deferring to the legislature, the majority would instead impose its own judgment to determine that a $100 threshold for requiring reporting is too low, that five disclosure reports in an election year are too many, and that the administrative costs of keeping records in accordance with the law are too high. These issues are typically and best left to Minnesota’s democratically elected legislators.
Applying the Planned Parenthood standard, I would find Minnesota’s disclosure laws likely to be constitutional. In Citizens United, the Supreme Court held that *881 courts should consider disclosure requirements under the exacting scrutiny framework because those laws do not suppress speech by ‘“impos[ing a] ceiling on campaign-related activities’ [or] ‘preventing] anyone from speaking.’ ” Citizens United, 130 S.Ct. at 914 (quoting Buckley v. Valeo, 424 U.S. 1, 64, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) and McConnell v. Fed. Election Comm’n, 540 U.S. 93, 201, 124 S.Ct. 619, 157 L.Ed.2d 491 (2003)). I agree with the majority that a disclosure law might suppress speech and thus trigger strict scrutiny if it directly imposed limitations on speech, such as by requiring an association to speak through a PAC or by limiting contributions or expenditures above a certain amount. However, I disagree with the majority’s suggestion that strict scrutiny might apply to a law that does not directly limit speech simply because the burdens the law imposes are viewed as heavy enough to be an indirect limit. Subjecting disclosure laws to this type of analysis is circular and conclusory; it requires a court to assess the burden of a disclosure law to determine what level of scrutiny applies, then to evaluate that burden again under exacting or strict scrutiny. This analysis also leads the majority to underestimate the states’ interests in disclosure laws and overestimate the burdens those laws impose on speech. It is sufficient to consider the burdens disclosure laws impose once, in the course of the exacting scrutiny analysis the Supreme Court has indicated is appropriate. See Citizens United, 130 S.Ct. at 914.
The Minnesota disclosure laws do not directly suppress speech, and so exacting scrutiny is the appropriate framework for considering their constitutionality. The Minnesota laws neither prevent an association from speaking for itself, nor do they impose any limit on the amount of speech in which an association can engage. First, the laws do not require an association to speak through another entity to engage in campaign-related speech. In Citizens United, the Supreme Court found such a requirement particularly troubling because allowing a corporation to speak only through a separate association “does not allow corporations to speak” at all. Citizens United, 130 S.Ct. at 897. In contrast, under the Minnesota laws, a corporation does not need to be a separate association from the political fund it establishes. Rather, it can retain full control over the operations of a political fund it creates, including by appointing a corporate employee or officer as the fund’s treasurer and by directing the political fund to return any excess contributions and dissolve. Thus, the Minnesota laws avoid the constitutional infirmity the Supreme Court addressed in Citizens United. Secondly, unlike the PACs the Supreme Court considered in Citizens United, under the Minnesota laws a corporation can contribute an unlimited amount directly to its political fund, and the political fund can use these contributions to make expenditures. See Citizens United, 130 S.Ct. at 887-88. This contrasts with the restrictions the Court confronted in Citizens United, under which corporations could only use “donations from stockholders and employees of the corporation” for express advocacy or electioneering communications. Id. at 888.
Under the exacting scrutiny framework, disclosure laws survive if the government shows “a relevant correlation or substantial relation between the governmental interest and the information required to be disclosed.” Davis v. Fed. Election Comm’n, 554 U.S. 724, 744, 128 S.Ct. 2759, 171 L.Ed.2d 737 (2008) (internal quotation marks omitted). In other words, “the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights.” Id. I would hold that Minnesota’s disclosure *882 laws meet this test and are likely to be constitutional.
Although Minnesota has pointed to several important state interests that its disclosure laws serve, the majority opinion provides little discussion of these interests, other than to note they exist. See supra at 876-77. In my view, this apparent discounting of the state’s interests and the resulting focus almost solely on the burdens the laws impose presents an unbalanced and flawed application of the exact: ing scrutiny analysis.
First, arid most importantly, the state has an important interest in providing the voting public with information about which associations and corporations support particular issues and candidates. This is an interest that the Supreme Court has time and again found to be important. See, e.g., Citizens United, 130 S.Ct. at 914 (“[Disclosure could be justified based on a governmental interest in providing the electorate with information about the sources of election-related spending.” (internal marks and alterations omitted)); McConnell, 540 U.S. at 196, 124 S.Ct. 619 (“providing the electorate with information” is an important state interest); Buckley, 424 U.S. at 66-67, 96 S.Ct. 612 (“[Disclosure provides the electorate with information as to where political campaign money comes from and how it is spent by the candidate in order to aid the voters in evaluating those who seek federal office. It allows voters to place each candidate in the political spectrum more precisely than is often possible solely on the basis of party labels and campaign speeches.” (internal quotation marks and citations omitted)). In elections, it is important for voters to hear directly from candidates and campaigns about their views on the issues. However, it is also important for voters to know which groups support or oppose a candidate or initiative; this information allows voters to better understand the political and practical ramifications of a ballot issue or the election of a candidate. As the Ninth Circuit explained, “[kjnowing which interested parties back or oppose a ballot measure is critical, especially when one- considers that ballot-measure language is typically confusing, and the long-term "policy ramifications of the ballot measure are often unknown.” Family PAC v. McKenna, 685 F.3d 800, 808 (9th Cir.2012) (internal quotation marks omitted).
Our sister circuits have found this informational interest important even with respect to smaller expenditures:
The public has an interest in knowing [ ] that a ballot measure has been supported by a multitude of gifts, even small gifts, from a particular state or from a specific profession.... The issue is thus not whether voters clamor for information about each “Hank Jones” who gave $100 to support an initiative. Rather, the issue is whether the cumulative effect of disclosure ensures that the electorate will have access to information regarding the driving forces backing and opposing each bill.
Nat'l Org. for Marriage, Inc. v. McKee, 669 F.3d 34, 41 (1st Cir.2012) (internal quotation marks omitted); see also Family PAC, 685 F.3d at 810 (“[Sjmall contributions may provide useful information to voters when considered in the aggregate.”).
Secondly, shareholders of corporations that engage in campaign-related speech possess a particular informational interest in disclosure. As partial owners of corporations, these people have an important interest, both politically and from a business perspective, in knowing about a corporation’s campaign-related speech. See Citizens United, 130 S.Ct. at 916. Disclosure allows shareholders to “determine whether their corporation’s political speech advances the corporation’s interest in mak *883 ing profits, and citizens can see whether elected officials are in the pocket of so-called money interests.” Id. (internal quotation marks omitted). Furthermore, in the age of the internet, quick and full disclosure to shareholders is not only possible, but relatively easy to accomplish. Id.
Third, disclosure prevents improper or suspect relationships between elected officials and the persons or groups that support them. As the Supreme Court noted in Buckley, that “exposure may discourage those who would use money for improper purposes either before or after the election. A public armed with information about a candidate’s most generous supporters is better able to detect any post-election special favors that may be given in return.” Buckley, 424 U.S. at 67, 96 S.Ct. 612; see also L. Brandeis, Other People’s Money 62 (National Home Library Foundation ed. 1933) (“Publicity is justly commended as a remedy for social and industrial diseases. Sunlight is said to be the best of disinfectants; electric light the most efficient policeman.”).
Finally, “and not least significantly],” disclosure requirements serve an important “means of gathering the data necessary to detect violations” of campaign finance laws. Buckley, 424 U.S. at 67-68, 96 S.Ct. 612. This interest is particularly relevant to the Minnesota disclosure laws’ requirements for an association to name a treasurer, segregate its political funds, and conduct record-keeping. These requirements, which the majority describes as “only tangentially related to disclosure,” supra at 875 n. 9, help Minnesota ensure compliance with its disclosure laws. The ongoing reporting requirement is also particularly relevant to this interest — it allows the state to easily monitor compliance with its disclosure laws and obtain more complete information on political contributions and expenditures. This important interest is not out of proportion to the minimal burden the ongoing reporting requirement imposes on associations.
Turning to the issue of those burdens, I would find that they are not nearly as heavy as the majority characterizes them to be. To comply with Minnesota’s laws, a corporation can appoint an employee or officer as treasurer of its political fund. The fund itself can be as simple as an internal bookkeeping device that separates and tracks contributions and expenditures. This internal bookkeeping option significantly limits the cost of complying with Minnesota’s regulations. Indeed, in a political fund’s simplest form, a treasurer acts as little more than a custodian of the records. Moreover, the information the Minnesota laws require to be disclosed about the corporation’s contributions and expenditures is similar to the disclosure requirements upheld in Citizens United. The federal law in that case required “any person who spends more than $10,000 on electioneering communications within a calendar year [to] file a disclosure statement with the FEC. That statement must identify the person making the expenditure, the amount of the expenditure, the election to which the communication was directed, and the names of certain contributors.” Citizens United, 130 S.Ct. at 914 (citing 2 U.S.C. § 434(f)(1), (2)).
The Minnesota legislature has chosen to impose these burdens not on everyone who makes campaign-related expenditures, but rather, only on those who spend more than $100 in one year. With regard to this decision of where to set reporting thresholds, “we cannot require [the legislature] to establish that it has chosen the highest reasonable threshold. The line is necessarily a judgmental decision, best left in the context of this complex legislation to [legislative] discretion.” Buckley, 424 U.S. at 83, 96 S.Ct. 612. As in Buckley, the *884 $100 reporting threshold for the Minnesota disclosure laws is not “wholly without rationality.” Id.; see also Planned Parenthood, 530 F.3d at 732 (“ ‘[Governmental policies implemented through legislation or regulations developed through presumptively reasoned democratic processes are entitled to a higher degree of deference and should not be enjoined lightly.’ ” (quoting Able, 44 F.3d at 131)). Accordingly, we should review these decisions with extreme deference, and require only that the legislature’s choice be rational. See Buckley, 424 U.S. at 82-83, 96 S.Ct. 612 (finding Congress’s $10 threshold for reporting contributors’ names and addresses and its $100 threshold for reporting contributors’ names, addresses, occupations, and principal place of business not “wholly without rationality”); Family PAC, 685 F.3d at 811 (affirming a $25 threshold for reporting contributors’ names and addresses and a $100 threshold for reporting names, addresses, occupations, and employers, and noting that “disclosure thresholds, like contribution limits, are inherently inexact; courts therefore owe substantial deference to legislative judgments fixing these amounts”); Nat’l Org. for Marriage v. Daluz, 654 F.3d 115, 119 (1st Cir.2011) (finding Rhode Island’s $100 reporting threshold not “wholly without rationality”); Nat’l Org. for Marriage v. McKee, 649 F.3d 34, 60-61 (1st Cir.2011) (affirming a $100 reporting threshold even though it was not indexed for inflation); Daggett v. Comm’n on Governmental Ethics & Election Practices, 205 F.3d 445, 466 (1st Cir.2000) (finding a $50 reporting threshold not illegitimate). But see Sampson v. Buescher, 625 F.3d 1247, 1261 (10th Cir.2010) (finding unconstitutional Colorado’s $20 threshold for reporting contributors’ names and addresses and $100 threshold for reporting names, addresses, occupations, and employers because these contributions “are sufficiently small that they say little about the contributors’ views of their financial interest in the annexation issue”); Canyon Ferry Rd. Baptist Church of E. Helena, Inc. v. Unsworth, 556 F.3d 1021, 1033-34 (9th Cir.2009) (finding Montana’s “zero dollar” reporting threshold “wholly without rationality” because “[a]s a matter of common sense, the value of this financial information to the voters declines drastically as the value of the expenditure or contribution sinks to a negligible level. As the monetary value of an expenditure in support of a ballot issue approaches zero, financial sponsorship fades into support and then into mere sympathy”). Minnesota’s $100 reporting threshold, based on the important state interests discussed above, is not wholly without rationality.
The majority characterizes the requirements the Minnesota laws impose as “onerous restrictions,” supra at 872, predicting that they would “manifestly discourage[ ] associations, particularly small associations with limited resources, from engaging in protected political speech. Supra at 873-74. In explaining why it views the disclosure requirements to be so heavy, the majority points primarily to the ongoing reporting requirement. It is true that associations must continue to make disclosures once they have established a political fund and until they dissolve that fund. However, this burden is neither heavy nor out of proportion with the state’s important interest in disclosure. See SpeechNow.org v. Fed. Elec. Comm’n, 599 F.3d 686, 696-98 (D.C.Cir.2010) (upholding 2 U.S.C. § 434(a)(4), which requires political committees to file quarterly reports, a pre-election report, and a post election report in election years; and either biannual or monthly reports during non-election years); see also Nat’l Org. for Marriage v. McKee, 649 F.3d 34, 58 (1st Cir.2011) (noting that the upheld statute requires “reports both on a quarterly basis and shortly before or after each *885 election,” but stating that plaintiff does not contest that the “reporting requirements bear a substantial relation to Maine’s informational interest”).
While I do not deny that the Minnesota laws impose some burden on associations wishing to make political expenditures, that burden is not out of proportion with either the state’s interest in the legislation or to other administrative burdens associations bear on a daily basis. Unlike the less forgiving strict scrutiny framework, exacting scrutiny analysis is designed precisely to allow courts to acknowledge burdens laws impose, and consider whether those burdens are sufficiently offset by state interests. See Citizens United, 130 S.Ct. at 914 (applying exacting scrutiny because “[disclaimer and disclosure requirements may burden the ability to speak, but the impose no ceiling on campaign-related activities and do not prevent anyone from speaking” (internal quotation marks and citation omitted)).
The ongoing reporting requirement requires associations that make political contributions to file five reports during a general election year (every other year in Minnesota) and one report during each year in which there is no election. Minn. Stat. § 10A.20, subdiv. 2. These reports must contain information about the political fund’s liquid assets, contributions made to it, loans it made or received, expenditures it made, and disbursements it made during the reporting period. Minn.Stat. § 10A.20, subdiv. 3. Importantly, if the political fund was inactive during the reporting period, it may simply file a statement of inactivity, which comprises a one-page form, on which the treasurer can check a box for inactivity. Minn.Stat. § 10A.20, subdiv. 7. Moreover, an association can easily create and dissolve a political fund, thereby allowing it to limit its exposure to Minnesota’s regulations to the time period in which it is actively engaging in political speech. See Minn.Stat. §§ 10A.14,10A.24.
The majority acknowledges Minnesota can impose ongoing disclosure requirements on corporations and associations that actually make contributions in a reporting period. See supra at 876-77. In the end, the majority’s conclusion of a likely constitutional violation solely centers on the reporting requirement for those associations that choose not to terminate the fund but conduct no activity during the reporting period. Supra at 877. The majority concludes that filing a single-page form and checking one box once in non-election years and five times in an election year imposes an undue burden on speech. I respectfully disagree and do not believe Minnesota’s check-the-box requirement rises to the level of a constitutional violation.
The majority attempts to illustrate the “onerous” burdens of the Minnesota disclosure laws by considering a hypothetical case of two farmers who wish to erect a sign to support a candidate for state office. As a preliminary matter, the Supreme Court has repeatedly cautioned against using hypothetical situations as a basis for deciding a law’s constitutionality: the “power of pronouncing an Act of Congress unconstitutional” is “delicate,” and it “would indeed be undesirable for this Court to consider every conceivable situation which might possibly arise in the application of complex and comprehensive legislation.” United States v. Raines, 362 U.S. 17, 21-22, 80 S.Ct. 519, 4 L.Ed.2d 524 (1960) (internal quotation marks omitted); see also Cnty. Court of Ulster Cnty., N.Y. v. Allen, 442 U.S. 140, 155, 99 S.Ct. 2213, 60 L.Ed.2d 777 (1979) (“As a general rule, if there is no constitutional defect in the application of the statute to a litigant, he does not have standing to argue that it would be unconstitutional if applied to *886 third parties in hypothetical situations.”); Tilton v. Richardson, 403 U.S. 672, 682, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971) (plurality opinion) (“We cannot ... strike down an Act of Congress on the basis of a hypothetical ‘profile.’ ”); United Pub. Workers of Am. v. Mitchell, 330 U.S. 75, 89-90, 67 S.Ct. 556, 91 L.Ed. 754 (1947) (“The power of courts, and ultimately of this Court to pass upon the constitutionality of acts of Congress arises only when the interests of litigants require the use of this judicial authority for their protection against actual interference. A hypothetical threat is not enough.”); Anniston Mfg. Co. v. Davis, 301 U.S. 337, 353, 57 S.Ct. 816, 81 L.Ed. 1143 (1937) (“Constitutional questions are not to be decided hypothetically. When particular facts control the decision they must be shown.”). Because Minnesota Citizens does not bring an overbreadth challenge here, we should not consider the effects of the Minnesota disclosure laws on third parties. See Members of City Council of Los Angeles v. Taxpayers for Vincent, 466 U.S. 789, 798, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984) (“[T]he very existence of some broadly written statutes may have such a deterrent effect on free expression that they should be subject to challenge even by a party whose own conduct may be unprotected.”).
Even considering the majority’s hypothetical situation as an example, it is clear that the burdens of Minnesota’s disclosure laws are far from heavy. It is worth noting at the outset that these requirements would hardly be onerous for our hypothetical farmers. The majority’s hypothetical seems to assume that the farmers are unsophisticated business people, inexperienced in filling out forms and interacting with the bureaucracy of government. However, even the smallest business regularly files government forms and reports that are significantly more complicated and burdensome than the requirements of Minnesota’s disclosures laws. I make this point not to argue that any burden less than that of filing taxes or employment forms is constitutional, but to point out that we should not consider the burdens the Minnesota laws impose in a vacuum. Moreover, while I acknowledge the majority’s assertion that the Minnesota laws require associations to choose whether to comply with the disclosure requirements or refrain from protected First Amendment activity, see supra at 874, I do not believe this fact automatically makes the laws likely to be found unconstitutional. Indeed, the Supreme Court has, on several occasions, upheld regulations that condition constitutionally protected conduct on compliance with regulatory requirements. See, e.g., Anderson v. Celebrezze, 460 U.S. 780, 788, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983) (noting that although “rights of voters are fundamental,” states may enact “comprehensive and sometimes complex election codes” that “govern the registration and qualification of voters, the selection and eligibility of candidates, or the voting process itself,” even though these regulations “inevitably affectf ] — at least to some degree — the individual’s right to vote and his right to associate with others for political ends”); Cox v. New Hampshire, 312 U.S. 569, 576, 61 S.Ct. 762, 85 L.Ed. 1049 (1941) (upholding a state statute requiring licenses for parades and processions and finding “it impossible to say that the limited authority conferred by the licensing provisions of the statute in question as thus construed by the state court contravened any constitutional right”).
Under the Minnesota laws, the farmers would file a statement of registration within fourteen days of their initial expenditure. For these two farmers, the report would contain minimal information — likely only the source of the contributions that paid for the sign, the expenditures made for the sign, and the names and addresses of the association’s members — the two *887 farmers. After this initial report, the farmers would, as the majority notes, be subject to ongoing reporting requirements. They would be required to file a total of five reports during election years and one report during non-election years. These reports would contain information on any further political activity undertaken by the farmers’ association. If, as the majority’s hypothetical situation indicates, the farmers did not make further expenditures after their initial expenditure on the sign, these reports would simply be a statement of inactivity — their reporting requirements would consist solely of checking one box on a one-page form.
If the farmers wished to escape this ongoing reporting requirement, this too would be an option for them under the Minnesota disclosure laws. The farmers could choose to dissolve their association by settling debts, disposing of remaining assets in excess of $100, and filing a termination report. Minn.Stat. § 10A.24, sub-div. 1. For these two farmers, settling debts and returning contributions would likely be a non-existent or minimal burden, as their activity — paying for and constructing a sign^ — -was also slight.
Thus, Minnesota’s disclosure laws do not subject associations to “the full panoply of regulations that accompany status as a [federal PAC],” as the majority argues. See supra at 875. This is true notwithstanding the majority’s observation that “Minnesota’s law imposes virtually identical regulatory burdens on political funds as it does political committees.” Supra at 872. As the First Circuit has noted, “[i]t is not the designation as a PAC but rather the obligations that attend PAC designation that matter for purposes of First Amendment review.” Nat’l Org. for Marriage v. McKee, 649 F.3d 34, 56 (1st Cir.2011). Here, where Minnesota’s disclosure laws subject its PACs and political funds to requirements that are less burdensome than those of federal PACs, the fact that political funds and PACs are subject to similar requirements is insignificant.
Minnesota’s interests in its disclosure laws are important and substantial. And while the laws undeniably impose some burdens on associations in Minnesota that engage in campaign-related speech, these burdens are not heavy and are substantially related to the government’s disclosure interests. Under exacting scrutiny, the mere existence of burdens on campaign-related speech is insufficient to render a restriction unconstitutional. Rather, for a court to find a restriction unconstitutional under exacting scrutiny, those burdens must lack a substantial relation to the government’s interest in that regulation. Davis, 554 U.S. at 744, 128 S.Ct. 2759. Here, this is simply not the case. Thus, I would hold that the Minnesota laws meet the requirements of exacting scrutiny and are likely to be constitutional disclosure requirements.