2014 CO 44

**Scott GESSLER, in his official capacity as Colorado Secretary of State, Petitioner**

v.

**COLORADO COMMON CAUSE AND Colorado ETHICS WATCH, Respondents**

**Supreme Court Case No. 12SC783**

Supreme Court of Colorado.

June 16, 2014

Attorneys for Petitioner: John W. Suthers, Attorney General Matthew D. Grove, Assistant Attorney General Denver, Colorado

Attorneys for Respondent Colorado Common Cause: Hill & Robbins, PC Jennifer H. Hunt Nathan P. Flynn Denver, Colorado

Attorneys for Respondent Colorado Ethics Watch: Luis Toro Margaret Perl Denver, Colorado

Attorneys for Amicus Curiae Center for Competitive Politics: Allen Dickerson Alexandria, Virginia

Attorneys for Amicus Curiae Institute for Justice: William H. Mellor Arlington, Virginia

Attorneys for Amicus Curiae Citizens for Integrity: Recht Kornfeld PC Mark G. Grueskin Denver, Colorado

CHIEF JUSTICE RICE delivered the Opinion of the Court.

¶ 1 We granted certiorari [1] to consider the lawfulness of Secretary of State Rule 4.1, 8 Colo.Code Regs. § 1505–6:4.1 (2013). Petitioner Colorado Secretary of State Scott Gessler ("Gessler") promulgated Rule 4.1 in response to *Sampson v. Buescher*, 625 F.3d 1247 (10th Cir.2010). Significantly, Rule 4.1

increases the contribution and expenditure threshold that triggers issue committee status from $200 to $5000 and exempts retrospective reporting of contributions and expenditures once issue committee status is achieved. We hold that *Sampson* did not invalidate either the $200 contribution and expenditure threshold under article XXVIII, section 2(10)(a)(II) of the Colorado Constitution ("article XXVIII") or the retrospective reporting requirement under section 1–45–108(1)(a)(I), C.R.S. (2013), of the Fair Campaign Practices Act ("section 1–45–108"). Thus, because Rule 4.1's $5000 threshold and its retrospective reporting exemption clearly conflict with these provisions, we hold Rule 4.1 unlawful and set it aside. We therefore affirm the judgment of the court of appeals because the court of appeals properly concluded that Gessler exceeded his authority in promulgating Rule 4.1. *See Colo. Common Cause v. Gessler*, 2012 COA 147, ¶ 27, —— P.3d ——.

## I. Facts and Procedural History

¶ 2 In 2010, the Tenth Circuit decided *Sampson*, a campaign finance case that required the Tenth Circuit to consider whether Colorado's registration and reporting requirements for issue committees [2] were unconstitutional as applied to the plaintiffs' small-scale [3] issue committee. 625 F.3d at

---

1. We specifically granted certiorari to review the following issues:
    1. Whether the Secretary of State correctly concluded that *Sampson v. Buescher*, 625 F.3d 1247 (10th Cir.2010), invalidated registration and reporting requirements for all issue committees that raise or spend similarly small amounts of money.
    2. Based on *Sampson v. Buescher*, 625 F.3d 1247 (10th Cir.2010), whether the Secretary of State, under his constitutional and statutory authority to "[p]romulgate such rules ... as may be necessary to administer and enforce" campaign finance laws, can promulgate a rule that establishes the line at which an issue committee's financial contributions or expenditures exceed the burden of state regulation.

2. Under article XXVIII, section 2(10)(a) of the Colorado Constitution, "issue committee" is defined as
    any person, other than a natural person, or any group of two or more persons, including natu-

ral persons: (I) That has a major purpose of supporting or opposing any ballot issue or ballot question; [and] (II) That has accepted or made contributions or expenditures in excess of two hundred dollars to support or oppose any ballot issue or ballot question.

3. The *Sampson* plaintiffs, who opposed a ballot initiative to annex the Parker North neighborhood into the Town of Parker, received a total of $2239.55 in contributions ($813.55 were in-kind contributions and $1426.00 were cash contributions) and made a total of $1992.37 in expenditures ($1178.82 went toward attorney fees). *Sampson*, 625 F.3d at 1249, 1260 n. 5. We use the phrase "small-scale issue committee" to denote issue committees that raise and spend similarly small amounts of money. In so doing, we do not imply that the size of contributions and expenditures is the only relevant factor for determining whether future issue committees are sufficiently similar to the *Sampson* plaintiffs to be excused from the registration and reporting re-

1249, 1259–60. Employing exacting scrutiny, the Tenth Circuit held that Colorado's requirements for issue committees violated the plaintiffs' freedom of association. *Id.* at 1249, 1261. To support its holding, the Tenth Circuit reasoned both that the financial burden of complying with the issue committee requirements approached or exceeded the value of financial contributions made to the plaintiffs' political effort and that the governmental interest in enforcing such requirements is minimal when the amount contributed is so small. *Id.* Importantly, however, the Tenth Circuit explicitly declined to "draw a bright line below which a ballot-issue committee cannot be required to report contributions and expenditures." *Id.*

¶ 3 Recognizing that *Sampson* invalidated the registration and reporting requirements for at least some issue committees in Colorado, Gessler promulgated Rule 4.1 [4] to clarify which issue committees were subject to the requirements. Unlike the issue committee requirements that the Tenth Circuit considered in *Sampson*—which establish a *$200* contribution and expenditure threshold that triggers issue committee status and require *both retrospective and prospective* reporting of contributions and expenditures once issue committee status is achieved—the new requirements under Rule 4.1 establish a *$5000* contribution and expenditure threshold and require *only prospective* reporting of contributions and expenditures.

¶ 4 Shortly after Rule 4.1 was adopted, Respondents Colorado Common Cause and Colorado Ethics Watch filed this action in Denver District Court pursuant to section 24-4-106, C.R.S. (2013), alleging that Gessler exceeded his rulemaking authority by promulgating Rule 4.1. Emphasizing Rule 4.1's departure from both the $200 contribution and expenditure threshold under article XXVIII and the retrospective reporting requirement under section 1-45-108, Respondents urged the district court to set aside the rule. Ruling in favor of Respondents, the district court began its analysis by noting

that neither article XXVIII nor section 1-45-108 was invalidated as a result of *Sampson*'s as-applied holding. In light of the continued viability of these provisions, the district court found that the increased contribution and expenditure threshold in Rule 4.1 "not only conflict[ed] with, but abrogate[d], existing constitutional and statutory requirements" for issue committees. Moreover, the district court observed that Rule 4.1's retrospective reporting exemption, which excludes the first $5000 from reporting "even if it is part of a multi-million dollar campaign," did not align with *Sampson*'s narrow as-applied holding. Emphasizing that "the Secretary is not empowered to promulgate rules that add to, modify, or conflict with constitutional provisions," the district court concluded that Gessler's promulgation of Rule 4.1 exceeded his authority. Accordingly, the district court set aside Rule 4.1.

¶ 5 Gessler appealed, arguing that he did not exceed his authority because Rule 4.1 merely clarified the applicability of the registration and reporting requirements to issue committees in light of *Sampson*. According to Gessler, such clarification was necessary because the Tenth Circuit created constitutional ambiguity by declining to specify which issue committees could be subject to Colorado's registration and reporting requirements. The court of appeals disagreed, holding that Gessler exceeded his authority in promulgating Rule 4.1 and that the rule must be set aside. *Common Cause,* ¶ 27. In affirming the district court's order, the court of appeals noted that Rule 4.1 not only "effectively modified and contravened Colorado campaign finance law" but also "invalidate[d] the requirements imposed on issue committees far beyond the reach of *Sampson*." *Id.* at ¶¶ 25, 27.

¶ 6 Gessler appealed again, and we granted certiorari review.

## II. Standard of Review

■ ¶ 7 The court of appeals' holding that Gessler exceeded his rulemaking au-

---

quirements under article XXVIII and section 1-45-108.

**4.** Rule 4.1 was originally codified as Rule 4.27. See 8 Colo.Code Regs. § 1505-6:4.1 (2013). Al-

though the parties, the district court, and the court of appeals refer to Rule 4.27, we refer to the current numbering of the rule in order to reduce confusion for future litigants.

thority hinges on the court of appeals' determination that Rule 4.1 conflicts with article XXVIII and section 1–45–108. Constitutional interpretation and statutory interpretation present questions of law that we review de novo. *See Bruce v. City of Colo. Springs,* 129 P.3d 988, 992 (Colo.2006); *MDC Holdings, Inc. v. Town of Parker,* 223 P.3d 710, 717 (Colo.2010). As part of our de novo review, "we may consider and defer to an agency's interpretation of its own enabling statute and [of] regulations the agency has promulgated." *Bd. of Cnty. Comm'rs v. Colo. Pub. Utils. Comm'n,* 157 P.3d 1083, 1088 (Colo.2007). Such deference, however, is not warranted where, as here, the agency's interpretation is contrary to constitutional and statutory law. *See, e.g., Three Bells Ranch Assocs. v. Cache La Poudre Water Users Ass'n,* 758 P.2d 164, 172 (Colo. 1988); *see also* § 24–4–106(7), C.R.S. (2013) (providing that courts "*shall* hold unlawful and set aside" any agency action that is "contrary to law" (emphasis added)).

### III. Analysis

¶ 8 It is undisputed that the Secretary of State is vested with authority to promulgate rules that are necessary to administer and enforce campaign finance laws. *See* Colo. Const. art. XXVIII, § 9(1)(b) (providing that the Secretary of State "shall" promulgate such rules "as may be necessary to administer and enforce" any provision of article XXVIII); *see also* § 1–45–111.5(1), C.R.S. (2013); § 1–1–107(2)(a), C.R.S. (2013). This authority, however, is not limitless; the Secretary of State does not have authority to promulgate rules that conflict with other provisions of law. *See* § 24–4–103(4)(b)(IV), C.R.S. (2013) (providing that an agency rule can be adopted only if it "does not conflict with other provisions of law"); § 24–4–103(8)(a) (providing that "any rule … which conflicts with a statute shall be void"); § 24–4–106(7) (requiring courts to set aside agency actions that are "contrary to law"). Thus, resolution of this case turns on whether Rule 4.1 conflicts with either the $200 contribution

and expenditure threshold in article XXVIII or the retrospective reporting requirement in section 1–45–108—i.e., whether Gessler exceeded his authority in promulgating Rule 4.1. Gessler argues that he did not exceed his authority in promulgating Rule 4.1 because (1) *Sampson* created constitutional ambiguity by invalidating Colorado's registration and reporting requirements for at least some small-scale issue committees but declining to provide a bright-line rule, and (2) Rule 4.1 merely clarifies the line above which issue committees can be constitutionally subject to registration and reporting requirements. In contrast, Respondents contend that Gessler exceeded his authority in promulgating Rule 4.1 because (1) *Sampson* did not facially invalidate these provisions, and (2) Rule 4.1's $5000 threshold and its retrospective reporting exemption are in direct conflict with article XXVIII and section 1–45–108.

¶ 9 To evaluate the merits of these arguments, we start by determining whether *Sampson* invalidated either the $200 contribution and expenditure threshold in article XXVIII or the retrospective reporting requirement in section 1–45–108. If article XXVIII and section 1–45–108 were not facially invalidated by *Sampson* (i.e., if these provisions can still be constitutionally applied to *any* issue committees), the lawfulness of Rule 4.1 will depend on whether it conflicts with these provisions. Because we hold that *Sampson* did not facially invalidate article XXVIII and section 1–45–108, we next determine whether Rule 4.1 conflicts with the plain language of these provisions. If Rule 4.1 conflicts with either article XXVIII or section 1–45–108, then the rule must be set aside.[5]

### A. *Sampson* Did Not Facially Invalidate Article XXVIII and Section 1–45–108

■ ¶ 10 We begin our analysis by determining the extent to which *Sampson* invalidated the registration and reporting requirements for issue committees under article XXVIII and section 1–45–108. The ongoing

---

**5.** Regardless of the constitutional ambiguities created by *Sampson,* Gessler does not have authority to promulgate rules that are contrary to law. *See supra* pp. 234–35. Accordingly, to the extent that Rule 4.1 conflicts with article XXVIII or section 1–45–108, the ambiguities created by *Sampson* are immaterial to our analysis.

validity of these provisions hinges on whether the Tenth Circuit held article XXVIII and section 1–45–108 unconstitutional "on their face" or unconstitutional "as applied" to a particular set of circumstances. *See Women's Med. Prof'l Corp. v. Voinovich*, 130 F.3d 187, 193 (6th Cir.1997) (noting the "important difference in terms of outcome" between facial and as-applied challenges). Unlike a statute that is held unconstitutional on its face, which *cannot be enforced* in any future circumstances, a statute that is held unconstitutional as applied *can be enforced* in those future circumstances where it is not unconstitutional. *Id.; see also Ada v. Guam Soc'y of Obstetricians & Gynecologists*, 506 U.S. 1011, 1011, 113 S.Ct. 633, 121 L.Ed.2d 564 (1992) (Scalia, J., dissenting), *denying cert. to* 962 F.2d 1366 (9th Cir.1992) ("The practical effect of holding a statute unconstitutional 'as applied' is to prevent its future application in a *similar context*, but not to render it utterly inoperative." (emphasis added)).[6] Importantly, to determine whether a statute was held unconstitutional on its face or unconstitutional as applied, we look to "the breadth of the remedy employed."[7] *See Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 331, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010); *see also United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 477–78, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995) (contrasting a "facial challenge" with "a narrower remedy" that limits relief to the parties before the court).

¶ 11 Looking to the breadth of the remedy employed by the Tenth Circuit, it is clear

that article XXVIII and section 1–45–108 were only invalidated *as applied* to the *Sampson* plaintiffs. The final sentences of the Tenth Circuit's opinion are particularly instructive:

> Here, the financial burden of state regulation on Plaintiffs' freedom of association approaches or exceeds the value of their financial contributions to their political effort; and the governmental interest in imposing those regulations is minimal, if not nonexistent, in light of the small size of contributions. *We therefore hold that it was unconstitutional to impose that burden on Plaintiffs. We do not attempt to draw a bright* line below which a ballot-issue committee cannot be required to report contributions and expenditures.... *We say only that Plaintiffs' contributions and expenditures are well below the line.*

625 F.3d at 1261 (emphasis added). The Tenth Circuit's narrow as-applied remedy, which was carefully tailored to the facts before the court, did not render article XXVIII and section 1–45–108 completely inoperable. Accordingly, both article XXVIII and section 1–45–108 can be enforced in future circumstances where such enforcement is constitutional (i.e., in circumstances that are different from those at issue in *Sampson*).[8] *See Ada*, 506 U.S. at 1011, 113 S.Ct. 633.

## B. Rule 4.1 Directly Conflicts With Article XXVIII and Section 1–45–108

¶ 12 Because article XXVIII and section 1–45–108 remain enforceable, we next deter-

---

**6.** Similarly, the Colorado Constitution contemplates that provisions in article XXVIII remain enforceable even if such provisions are held unconstitutional as applied to a particular set of circumstances. Colo. Const. art. XXVIII, § 14 ("If any provision of this article or the application thereof to any persons or circumstances is held invalid, such invalidity shall not affect other provisions or applications of the article which can be given effect without the invalid provision or application....").

**7.** In other words, what is pleaded in a complaint is not dispositive of the facial versus as-applied inquiry. For example, the *Sampson* plaintiffs alleged that the registration and reporting requirements for issue committees were both facially unconstitutional and unconstitutional as applied. The Tenth Circuit, however, declined to analyze their facial arguments given its determi-

nation that the laws were unconstitutional as applied. *See Sampson*, 625 F.3d at 1253–54 ("We agree with [plaintiffs'] as-applied First Amendment argument, holding that the Colorado registration and reporting requirements have unconstitutionally burdened their First Amendment right of association. Because of that ruling, we need not address their other contentions."). Thus, in determining whether the Tenth Circuit invalidated the issue committee registration and reporting requirements on their face or as applied, we are not bound by the allegations in the plaintiffs' complaint.

**8.** Because resolution of this case turns on whether Rule 4.1 conflicts with article XXVIII and section 1–45–108, we need not—and do not—delineate exactly which issue committees can be constitutionally subject to the issue committee registration and reporting requirements.

mine whether Rule 4.1 conflicts with either of these provisions. If a conflict exists—i.e., if Rule 4.1 is "contrary to law"—we must hold Rule 4.1 unlawful and set it aside. *See* § 24-4-106(7) (providing that "the court shall hold unlawful and set aside" any agency action that is "contrary to law"). Importantly, the language at issue in Rule 4.1, article XXVIII, and section 1-45-108 is unambiguous; our analysis is therefore limited to the plain language of these provisions. *See Portercare Adventist Health Sys. v. Lego,* 2012 CO 58, ¶ 12, 286 P.3d 525 ("When [statutory] language is unambiguous, we give effect to the plain and ordinary meaning of the section without resorting to other rules of statutory construction."); *Regular Route Common Carrier Conference of Colo. Motor Carriers Ass'n v. Pub. Util. Comm'n,* 761 P.2d 737, 745 (Colo.1988) ("In construing an administrative rule, we apply those basic rules of interpretation which pertain to the construction of a statute.").

¶ 13 Looking first to the plain language of Rule 4.1, two provisions of the rule prove to be particularly relevant to our analysis. The first provision, which establishes the contribution and expenditure threshold that triggers issue committee status, provides that "an issue committee shall not be subject to any of the requirements of Article XXVIII or Article 45 of Title 1, C.R.S., until the issue committee has accepted *$5,000* or more in contributions or made expenditures of *$5,000* or more during an election cycle." 8 Colo. Code Regs. § 1505-6:4.1 (2013) (emphasis added). The second provision, which addresses the reporting requirements once issue committee status is achieved, provides that the "contributions received and expenditures made *before* reaching the $5,000

threshold are *not* required to be reported." 8 Colo.Code Regs. § 1505-6:4.1.1 (2013) (emphasis added).

¶ 14 Considering these provisions in light of the plain language of article XXVIII and section 1-45-108, two conflicts emerge. First, the relevant language in article XXVIII defines "issue committee," in part, as any group of two or more persons "that has accepted or made contributions or expenditures in excess of *two hundred dollars* to support or oppose any ballot issue or ballot question." Colo. Const. art. XXVIII, § 2(10)(a)(II) (emphasis added). On its face, the *$5000* threshold established in Rule 4.1 directly conflicts with the *$200* threshold established in article XXVIII.[9] *Cf. Bd. of Cnty. Comm'rs v. Colo. Oil and Gas Conservation Comm'n,* 81 P.3d 1119, 1125 (Colo.App.2003) (invalidating an agency rule amendment that replaced the words "operationally conflicting" with "any conflicting" because on its face the broader amended rule preempted local government actions and therefore conflicted with case law).

¶ 15 Second, the relevant language in section 1-45-108 provides that all issue committees "shall report to the appropriate officer *their contributions received, ... expenditures made,* and obligations entered into." § 1-45-108(1)(a)(I) (emphasis added). The plain language of section 1-45-108 does not restrict reporting to those contributions received and expenditures made *after* issue committee status is achieved; section 1-45-108 therefore requires reporting of contributions received and expenditures made both *before and after* issue committee status is achieved.[10] Thus, on its face the reporting

---

9. It is worth noting that the size of the disparity between the threshold in Rule 4.1 and the threshold in article XXVIII is immaterial to our analysis. Thus, a conflict would exist even if the threshold in Rule 4.1 was $201.

10. Our conclusion that section 1-45-108 contemplates both retrospective and prospective reporting reflects article XXVIII's underlying purpose to provide the public with *"full* and timely disclosure" of campaign contributions and expenditures. *See* Colo. Const. art. XXVIII, § 1 (emphasis added). Gessler's justifications for exempting retrospective reporting further bolster our conclusion. First, by characterizing his "decision[]

... to exempt contributions received and expenditures made prior to reaching the [issue committee] threshold" as a "necessary component[] of compliance with the *Sampson* decision," Gessler presupposes that retrospective reporting was required before *Sampson.* Pet'r's Reply Br. 24. Second, Gessler defends the exemption as "an appropriate exercise of administrative discretion" because requiring all issue committees to report the first dollars spent would "exacerbate" the administrative burdens on small-scale issue committees that *Sampson* invalidated, suggesting that issue committees were required to report retrospectively before Gessler intervened. Pet'r's Reply Br. 24–25.

exemption in Rule 4.1—which necessitates only *prospective* reporting—directly conflicts with the *retrospective* reporting requirement established in section 1–45–108. *Cf. Sanger v. Dennis*, 148 P.3d 404, 408, 416 (Colo.App. 2006) (agreeing with the district court's determination that an agency rule, which added an annual written consent requirement to the definition of "member," conflicted with article XXVIII because the consent requirement created a new condition not found in article XXVIII). Thus, because Rule 4.1 conflicts with both article XXVIII and section 1–45–108,[11] we hold Rule 4.1 unlawful and set it aside.

## IV. Conclusion

¶ 16 We hold that the $200 contribution and expenditure threshold for issue committees under article XXVIII, section 2(10)(a)(II) of the Colorado Constitution and the retrospective reporting requirement for issue committees under section 1–45–108(1)(a)(I) of the Fair Campaign Practices Act were not facially invalidated by the Tenth Circuit's holding in *Sampson*. Because Rule 4.1 directly conflicts with these still-valid provisions, we hold Rule 4.1 unlawful and set it aside. Accordingly, we affirm the judgment of the court of appeals because the court of appeals properly concluded that Gessler exceeded his authority in promulgating Rule 4.1.

JUSTICE EID concurs in the judgment in part and dissents in part.

JUSTICE HOOD concurs in part and dissents in part.

**11.** Although the existence of two conflicts bolsters our conclusion that Rule 4.1 is contrary to law, a single conflict would be sufficient to invalidate Rule 4.1.

**1.** As an important preliminary note, I would find that plaintiffs Colorado Common Cause and Colorado Ethics Watch do not have standing to challenge Rule 4.1. In order to challenge a final agency action, plaintiffs must demonstrate that they are "adversely affected or aggrieved by" the action. § 24–4–106(4), C.R.S. (2013). Here, Rule 4.1 cannot adversely impact plaintiffs' activities in any way, as they have taken the position that they will abide by the more restrictive limitations in place prior to the Rule's promulgation regardless of the outcome of this litigation. To the extent that plaintiffs argue that they have an interest in ensuring that the Secretary complies

JUSTICE EID, concurring in the judgment in part and dissenting in part.

¶ 17 I would largely affirm the court of appeals, but on a much narrower ground than the majority. The majority goes far beyond the court of appeals' opinion by holding that the Secretary may not issue a rule that deviates from the $200 limitation under any circumstances. But *Sampson* holds that the Secretary must deviate from that rule in a certain category of cases (involving small-scale issue committees), and contemplates that a bright-line rule would govern such cases. *Sampson v. Buescher*, 625 F.3d 1247, 1261 (10th Cir.2010). Because the majority has removed the rulemaking option from the Secretary's authority, the only means left for Colorado to discover where that line falls is post-hoc adjudication—that is, determining, through case-by-case adjudication, whether the small-scale issue committee in question is "sufficiently similar" to the one at issue in *Sampson* to warrant being excused from certain reporting requirements. Maj. op. ¶ 2 n. 3. Because this scenario raises serious concerns under the First Amendment, I cannot join the majority's rationale.[1]

¶ 18 For the majority, this is an easy case. First, the majority determines that *Sampson* was an as-applied challenge, and that therefore the Tenth Circuit did not invalidate the $200 limitation contained in Article XXVIII in all of its possible applications. Maj. op. ¶ 11. It then determines that because the $200 limitation "remain[s] enforceable," any

with Colorado law, their standing argument also fails. While we have stated that "a citizen has standing to pursue his or her interest in ensuring that governmental units conform to the state constitution," *Nicholl v. E–470 Pub. Highway Auth.*, 896 P.2d 859, 866 (Colo.1995), we made the statement in the context of taxpayer standing, and plaintiffs make no such claim of taxpayer status. The district court denied the Secretary's motion to dismiss for lack of standing, and the Secretary chose not to appeal that ruling. We have an obligation, however, to examine standing on our own. *Romer v. Bd. of Cnty. Com'rs.*, 956 P.2d 566, 585 (Colo.1998). Although I would find that plaintiffs have no standing to challenge the Rule, I address the merits in order to respond to the majority opinion.

rule that the Secretary might issue that is inconsistent with the $200 limitation—even a one dollar deviation—must be invalid. *Id.* at ¶¶ 12, 14 n. 9. Finally, it concludes that because Rule 4.1's limitation of $5,000 is plainly different from $200, Rule 4.1 must be invalid. *Id.* at ¶ 14.

¶ 19 In fact, although there has been much argument in this case over the scope of *Sampson,* the case is largely irrelevant under the majority's analysis. According to the majority, "Regardless of the constitutional ambiguities created by *Sampson,* Gessler does not have authority to promulgate rules that are contrary to law. Accordingly, to the extent that Rule 4.1 conflicts with article XXVIII or section 1–45–108, the ambiguities created by *Sampson* are immaterial to our analysis." Maj. op. ¶ 9 n. 5. Under the majority's reasoning, the case before us was over before it began.

¶ 20 But this case is a simple one only because of the majority's misstep in reasoning. No one, including the Secretary, disputes that *Sampson* was an as-applied challenge, and that therefore the $200 limitation was not invalidated in all possible applications. *See Sampson,* 625 F.3d at 1254 (describing plaintiffs' First Amendment challenge as "as-applied"). But *Sampson* did invalidate the $200 limitation with regard to some applications—namely, small-scale issue committees for whom "the financial burden of state regulation on [their] freedom of association approaches or exceeds the value of their financial contributions to their political effort." 625 F.3d at 1261. Therefore, the $200 limitation "remain[s] enforceable," to use the majority's terminology, maj. op. ¶ 12, only to the extent that it was not rendered unenforceable by order of the Tenth Circuit in *Sampson.* The question is thus not whether Rule 4.1 conflicts with the $200 limitation in any manner, as it surely does, but rather whether Rule 4.1 accurately describes the set of circumstances under which the Tenth Circuit ruled that the $200 limitation could not be enforced. *See Ada v. Guam*

*Soc. of Obstetricians and Gynecologists,* 506 U.S. 1011, 113 S.Ct. 633, 633, 121 L.Ed.2d 564 (1992) (Scalia, J., dissenting from the denial of the petition for certiorari) ("The practical effect of holding a statute unconstitutional 'as applied' is to prevent its future application *in a similar context.*" (emphasis added)).

¶ 21 I agree with the court of appeals that Rule 4.1 goes beyond what was compelled by *Sampson* in two limited respects. *Colo. Common Cause v. Gessler,* 2012 COA 147, ¶ 25, —— P.3d ——. As the court below pointed out, *Sampson* distinguished large-scale issue committees from the case before it, 625 F.3d at 1261, and Rule 4.1 does not preserve the $200 limitation with regard to those committees. *Gessler,* ¶ 25. The court of appeals further observed (as do the majority and dissenting opinions here, maj. op. ¶ 15; diss. op. ¶ 45) that *Sampson* did not require that small-scale issue committees be relieved of retrospective reporting requirements under section 1–45–108, C.R.S. (2013), *id.*—a proposition with which I also agree. Based on these deviations, the court of appeals concluded that Rule 4.1 went beyond *Sampson. Id.* at ¶ 27 ("[Rule 4.1] invalidates the requirements imposed on issue committees far beyond the reach of *Sampson*" and therefore "the Secretary exceeded his authority and the rule must be set aside as void.").[2] In my view, the court of appeals' mistake was to invalidate the Rule in its entirety based on two problematic applications. See *Pawnee Well Users, Inc. v. Wolfe,* 2013 CO 67, ¶ 21 n. 4, 320 P.3d 320 (noting that in order to raise a successful facial challenge, a plaintiff must demonstrate that the rule in question is "invalid in all its possible applications").

¶ 22 By prohibiting the Secretary from promulgating a rule that deviates from the $200 limitation in any way, the majority's opinion goes well beyond the court of appeals' opinion. Indeed, it directly conflicts with *Sampson,* which declined to draw a bright line itself but contemplated that one

**2.** The court of appeals also stated that "We do not agree with the Secretary ... that *Sampson* created a gap in the law, triggering his obligation to promulgate a rule." 2012 COA 147, ¶ 23, ——

P.3d ——. I read this statement in conjunction with the court's ultimate holding, which is that the Secretary, in its view, misperceived the scope of the gap.

would be drawn by others. 625 F.3d at 1261 ("We do not attempt to draw a bright line below which a ballot-issue committee cannot be required to report contributions and expenditures.... We say only that Plaintiff's contributions and expenditures *are well below the line*." (emphasis added)). Thus, under the majority's reasoning, the Secretary could not, for example, promulgate a rule that set the limitation at $200 for large-scale issue committees and at another amount for small-scale committees, nor could he promulgate a rule that set a limitation that is lower than $5,000 for any class of case.[3]

¶ 23 In the end, the majority leaves the Secretary with only one option: post-hoc, case-by-case adjudications to determine whether the particular small-scale issue committee in question is "sufficiently similar" to the one at issue in *Sampson* to warrant being excused from certain reporting requirements. Maj. op. ¶ 2 n. 3. This sort of after-the-fact, case-by-case adjudication of the applicability of campaign finance laws raises serious First Amendment concerns. *See FEC v. Wisconsin Right to Life*, 551 U.S. 449, 469, 127 S.Ct. 2652, 168 L.Ed.2d 329 (2007) (opinion of Roberts, C.J.) (holding that the First Amendment demands that an "objective" standard govern political speech, and that such a standard must "entail minimal if any discovery, to allow parties to resolve disputes quickly without chilling speech through the threat of burdensome litigation" and "eschew the open-ended rough-and-tumble of factors" which invites "complex argument" and "appeal") (citations and internal quotation marks omitted). It is thus a construction we should seek to avoid. *Catholic Health Initiatives Colorado v. City of Pueblo Dept. of Finance*, 207 P.3d 812, 822 (Colo.2009) (noting our "obligation to avoid interpretations that invoke constitutional deficiencies").

¶ 24 There is no question that we are not bound by *Sampson*. But the Secretary unquestionably is.[4] The majority thus places

the Secretary in the untenable position of abiding by *Sampson*, or abiding by this Court's order that essentially nullifies *Sampson*. Because I believe this tension is created only by the majority's misinterpretation of *Sampson* as it applies to the Secretary, I respectfully concur in the judgment in part and dissent in part.

JUSTICE HOOD, concurring in part and dissenting in part.

¶ 25 I am not persuaded that *Sampson*'s as-applied status limits its applicability; the breadth of its reasoning should.

¶ 26 And *Sampson*'s reasoning is broad: the Tenth Circuit declared Colorado's $200 threshold unconstitutional when it acts to squelch the First Amendment rights of those whose contributions and expenditures are "sufficiently small." *Sampson v. Buescher*, 625 F.3d 1247, 1261 (10th Cir.2010). It reasoned that Colorado's regulatory burdens were "substantial," and its regulatory interest was "minimal, if not nonexistent, in light of the small size of the contributions." *Id.* at 1259–61. The Tenth Circuit then concluded that the contributions and expenditures at issue—$2,239.55 in contributions and $1,992.37 in expenditures—were "well below" the line at which Colorado could constitutionally impose the regulatory burdens triggered by the $200 threshold. *Id.* at 1261.

¶ 27 The Secretary responded by promulgating Rule 4.1, which drew the line at $5,000. His statement accompanying the rule explained that, if plaintiffs' contributions and expenditures were "well below" the line at which Colorado could constitutionally impose its regulatory burdens, then the threshold must be raised "well above" what was found unconstitutional in *Sampson*. Hence, the $5,000 threshold.

¶ 28 But according to the majority, *Sampson* "only invalidated [Colorado's $200 issue committee threshold] *as applied* to the

---

**3.** Amici Citizens for Integrity argues that Rule 4.1's $5,000 limitation is too high, and the majority appears to have similar concerns. Maj. op. ¶ 14 (emphasizing *$200* and *$5,000*).

**4.** The court of appeals appeared to have difficulty with this point, noting that it "assum[ed] without

deciding the Secretary is so bound [to follow *Sampson*]." 2012 COA 147, ¶ 24, —— P.3d ——. The Secretary is not claiming that he is bound by *Sampson* by virtue of it being the law in the Tenth Circuit, as the court of appeals suggested, *id.* but rather because he was a party to the case.

*Sampson* plaintiffs." Maj. op. ¶ 11. Thus, any different threshold—even a one-dollar disparity—is void. *Id.* at ¶ 14 n. 9. The majority's reluctance to go further is understandable given that the Secretary's authority to promulgate a rule that conflicts with our state constitution is at issue. Nonetheless, I agree with Justice Eid that the Secretary is bound by *Sampson,* even if we are not. As she notes, the majority's holding "places the Secretary in the untenable position of abiding by *Sampson,* or abiding by this Court's order that essentially nullifies *Sampson.*" Dis. op. ¶ 24.

¶ 29 Because I disagree with the majority that *Sampson*'s as-applied status is dispositive, and because the Secretary's interpretation of *Sampson* reasonably comports with how I believe this court should read that case, I respectfully dissent from Section III.A of the majority opinion.

## I. *Sampson* Applies to All Groups with "Sufficiently Small" Contributions and Expenditures

¶ 30 As the majority recognizes, the "effect of holding a statute unconstitutional 'as applied' is to prevent its future application in a *similar context.*" Maj. op. ¶ 10 (quoting *Ada v. Guam Soc'y of Obstetricians & Gynecologists,* 506 U.S. 1011, 1011, 113 S.Ct. 633, 121 L.Ed.2d 564 (1992) (Scalia, J., dissenting from denial of certiorari)) (emphasis in majority opinion); *see also Sanger v. Dennis,* 148 P.3d 404, 411 (Colo.App.2006). To determine the breadth of *Sampson,* I examine the context in which it declared Colorado's $200 threshold unconstitutional.

¶ 31 *Sampson* involved a ballot initiative seeking to annex Parker North into the town of Parker, Colorado. 625 F.3d at 1251. A group of residents who opposed the initiative distributed "No Annexation" signs, mailed postcards summarizing its position, and gathered signatures. *Id.* After voters rejected the ballot initiative, annexation supporters sued the opponents, alleging that they had violated Colorado campaign finance law by failing to: (1) register as an issue committee; (2) establish a committee bank account with a separate tax identification number; and (3) comply with the reporting requirements. *Id.*

¶ 32 The supporters followed their complaint with a subpoena to produce the following information:

- All evidence of sales, purchases, gifts, or any transfers of any materials, showing the item, amount contributed or expended, and the fair market value of each item;

- Names, addresses, and phone numbers for all potential issue committee members;

- Names, addresses, and phone numbers for all contributors;

- All evidence concerning the amounts contributed or expended;

- All bank account information concerning contributions, expenditures, or campaign materials;

- All communications among the opponents or anyone else concerning the annexation issue; and

- Examples of information or campaign materials sold, gifted, or transferred to anyone concerning the annexation issue.

*Id.* at 1252.

¶ 33 The Secretary referred the complaint to Colorado's Office of Administrative Courts. *Id.* at 1251. The supporters then sent the opponents a "non-negotiable offer of settlement," under which they would plead guilty to all charges against them and either stop opposing annexation (and remove all signs and other materials in support of their position) or follow all laws governing issue committees. *Id.* at 1253.

¶ 34 With the assistance of counsel, whom the opponents felt compelled to hire, they registered the "No Annexation" issue committee and reported nonmonetary contributions in the form of signs, a banner, postcards, and postage, totaling $782.02. *Id.* at 1251–52. (The committee later reported additional cash contributions of $1,426 and an additional in-kind contribution of $31.53.) *Id.* at 1260 n. 5. Then they sued the Secretary, alleging that Colorado's $200 issue committee threshold unconstitutionally burdened their right of association. *Id.* at 1253.

¶ 35 The Tenth Circuit agreed. It began its analysis by noting that Colorado's campaign-disclosure laws were not meant to regulate issue committees like "No Annexation." *Id.* at 1254. Instead, their purpose was to curtail "large campaign contributions" that "allow wealthy individuals, corporations, and special interest groups to exercise a disproportionate level of influence over the political process." *Id.* (quoting Colo. Const. art. XXVIII, § 1).

¶ 36 With this backdrop in mind, the Tenth Circuit then compared the burdens of Colorado's regulatory scheme with the strength of its interests in disclosure. In the Tenth Circuit's view, the burdens on the opponents' right of association were "substantial." *Id.* at 1259. Issue committees must comply with an onerous and technical reporting schedule, which requires quarterly filings in off-election years; biweekly filings on Mondays beginning in May before a primary election; monthly filings beginning six months before the major election; bi-weekly filings on Mondays beginning in September before the major election; filings thirty days after the major election in election years; and filings fourteen days before and thirty days after a special legislative election held in an off-election year. *See* § 1–45–108(2)(a)(I)(A)–(F), C.R.S. (2013). Consequently, "[t]he average citizen cannot be expected to master on his or her own [Colorado's] many campaign financial-disclosure requirements." *Sampson,* 625 F.3d at 1259.

¶ 37 One opponent found the "laws difficult to understand" and was "constantly worried about being sued for even the smallest error." *Id.* at 1260. In her view, they were "counterintuitive; the forms were hard to follow; the website was often slow and had technical glitches; and getting questions answered often took several days and sometimes did not yield correct answers or even any answer at all." *Id.* The rules were "complex," filling nineteen pages, and the Secretary also published the "Colorado Campaign and Political Finance Manual," which contained an additional forty-one pages of text and fifty-one pages of appendices. *Id.* at 1250. It was "no surprise that [the opponents] felt the need to hire counsel" to de-

fend against the supporters' lawsuit. *Id.* at 1260. In the typical case, as in *Sampson,* attorney fees "would be comparable to, if not exceed," the contributions. *Id.* Navigating these regulations was a "substantial burden." *Id.*

¶ 38 On the other hand, Colorado's interests were "minimal" because, "[a]s a matter of common sense, the value of this *financial* information to the voters declines drastically as the value of the expenditure or contribution sinks to a negligible level." *Id.* (quoting *Canyon Ferry Rd. Baptist Church of E. Helena, Inc. v. Unsworth,* 556 F.3d 1021, 1033 (9th Cir.2009)) (emphasis in original). That is, the contributions were "sufficiently small that they say little about the contributors' views of their financial interest in the annexation issue." *Id.* at 1261.

¶ 39 In sum, "the financial burden of state regulation on [the opponents'] freedom of association approaches or exceeds the value of their financial contributions to their political effort; and the governmental interest in imposing those regulations is minimal, if not nonexistent, in light of the small size of the contributions." *Id.* The Tenth Circuit refused to draw a "bright line below which a ballot-issue committee cannot be required to report contributions and expenditures," but it found the opponents' contributions and expenditures "well below the line." *Id.* It thus held that "it was unconstitutional to impose that burden" on the opponents. *Id.*

¶ 40 By describing *Sampson*'s reasoning, I do not mean to suggest that I subscribe to it. *Sampson*'s conclusion that a state's interests in disclosure are "minimal" in the ballot initiative context is an open question. Indeed, the Ninth Circuit has come to the opposite conclusion, reasoning that "[k]nowing which interested parties back or oppose a ballot measure is critical, especially when one considers that ballot-measure language is typically confusing, and the long-term policy ramifications of the ballot measure are often unknown." *Cal. Pro–Life Council, Inc. v. Getman,* 328 F.3d 1088, 1106 (9th Cir.2003). This way, "voters will have a pretty good idea of who stands to benefit from the legislation." *Id.* That may be true, but we have not been asked to decide whether *Sampson*

was correctly decided; we have been asked to interpret *Sampson* to determine the validity of the Secretary's rule. And that task requires us to focus on its reasoning.

¶ 41 *Sampson*'s reasoning turns on the size of a group's contributions and expenditures–nothing more. The burdens to comply are "substantial" because Colorado's regulations are "complex," requiring "time, energy, and money" and, for the "average citizen," a lawyer. *Sampson*, 625 F.3d at 1259–60. Colorado's interest is "minimal" when the contributions and expenditures are "sufficiently small." *Id.* at 1261.

¶ 42 So what is "sufficiently small"? *Sampson* tells us: $2,239.55 in contributions and $1,992.37 in expenditures are "well below the line" at which Colorado's regulatory burdens are constitutionally acceptable. *Id.* As the contributions and expenditures get larger, so does Colorado's interest in regulating them, given that the purposes of the campaign-disclosure laws "have little to do with a group of individuals who have together spent less than $1,000 on a campaign (not including $1,179 for attorney fees)."[1] *Id.* The Secretary's response to *Sampson* (raising the $200 threshold to $5,000) is reasonable, given the breadth of its reasoning–the propriety of which is not at issue here.

¶ 43 The Secretary's rule has an additional benefit. It forestalls repeated litigation about the same issue and creates certainty regarding the monetary trigger for issue committee status. The majority's holding leaves the Secretary and potential issue committees without any guidance about the meaning of *Sampson*, the status of Colorado's $200 issue committee threshold, and the circumstances under which it can be constitutionally applied. These questions will have to be resolved by further piecemeal litigation.

¶ 44 I would reverse the court of appeals and uphold Rule 4.1's $5,000 threshold as a valid exercise of the Secretary's rulemaking authority.

---

1. To be sure, *Sampson* suggests that Colorado's $200 issue committee threshold could be constitutionally applied in cases "involving the expenditure of tens of millions of dollars on ballot issues presenting 'complex policy proposals.'" *Sampson*, 625 F.3d at 1261 (quoting *Cal. Pro–Life*

## II. Rule 4.1.1 is Unlawful

¶ 45 I agree with the majority's conclusion that Rule 4.1.1 conflicts with Colorado's campaign-disclosure laws. Like the majority, I interpret them as requiring both retrospective and prospective reporting. Maj. op. ¶ 15. I see nothing in *Sampson* that establishes an exemption from retrospective reporting. Nor am I convinced that retrospective reporting "exacerbates" the regulatory burdens *Sampson* found unconstitutional, as the Secretary suggests. Prospective issue committees must necessarily track their finances so they can avoid reporting requirements (by staying below the threshold) or comply with them (once they exceed it). Any additional burden imposed by retrospective reporting is not of constitutional significance. I thus agree with respondents' contention that, "at the very least, [Rule 4.1.1] is void," and concur in that portion of the majority's opinion declaring Rule 4.1.1 unlawful.

¶ 46 For the reasons stated, I respectfully concur in part and dissent in part.

*Council, Inc.*, 328 F.3d at 1105). But even that suggestion turns on the size of a group's contributions and expenditures, and I read it to stand for the uncontroversial proposition that Colorado's regulatory interest in such cases is obviously more than "minimal."