Opinion by JUDGE TOW
¶ 1 In this case, we are asked to decide whether an executive order issued thirty years ago provides continuing authorization for the Attorney General to prosecute Medicaid fraud and patient abuse cases across the state. We hold that it does and therefore reverse the order dismissing the charges against defendant, Jasmine Eloisa Salgado.
I. Factual Background
¶ 2 On March 4, 1987, then-Governor Roy Romer promulgated Colorado Executive Order No. D 0017 87, Continuing the Colorado Medicaid Fraud Control Unit in the Colorado Department of Law (the 1987 Executive Order). This executive order requires the Attorney General, through the Medicaid Fraud Control Unit (the MFCU), to investigate and prosecute Medicaid fraud and patient abuse cases "either in his capacity as attorney general, or when so designated, acting in the capacity of a special deputy district attorney."[1] Id. The 1987 Executive Order has never been repealed, rescinded, or modified.
*831 ¶ 3 In December 2017, the MFCU filed a felony charge involving neglect of an at-risk adult against Salgado, an employee of an assisted living facility. The Jefferson County District Attorney filed a notice asserting that the Attorney General lacked legal authority or jurisdiction to file and prosecute this case.[2] Specifically, the District Attorney argued that the executive order was an unconstitutional exercise of legislative power by the Governor, that the executive order did not authorize the Attorney General to prosecute cases in her own name, and that the executive order had been superseded by legislation.
¶ 4 The district court rejected the third argument and did not address the second. The court then reframed the District Attorney's first argument, asking if "a former governor [can] require the current Attorney General to act" and, more generally, how long a governor's executive order lasts. It then found that "Governor Romer had the authority to require the Attorney General to investigate and prosecute Medicaid fraud and patient abuse cases during his terms as governor" but that "reliance on the 1987 order to confer authority in 2018 would be an unconstitutional exercise of legislative power by the executive branch." It further found that "a former governor cannot require the current Attorney General to act." The district court then dismissed the charge.
¶ 5 The Attorney General appealed, and Salgado responded. The Jefferson County District Attorney, however, did not seek to intervene or otherwise assert its position before this court.
II. The Executive Order
¶ 6 No one involved in this case appears to challenge the Governor's general authority to direct the Attorney General to prosecute certain cases. Pursuant to section 24-31-101(1)(a), C.R.S. 2018, the Attorney General must "appear for the state and prosecute and defend all actions and proceedings, civil and criminal, in which the state is a party or is interested when required to do so by the governor...." When the Attorney General is required to prosecute a case, whether by the Governor or the General Assembly, "he becomes to all intents and purposes the district attorney, and may in his own name and official capacity exercise all the powers of such officer, for he is then, and in that case, the public prosecutor." Harrah v. People ex rel. Attorney Gen. , 125 Colo. 420, 427, 243 P.2d 1035, 1038 (1952) (quoting People v. Gibson , 53 Colo. 231, 244, 125 P. 531, 536 (1912) ).
¶ 7 Instead, we are asked to determine whether the particular grant of authority in the 1987 Executive Order went beyond what is authorized by section 24-31-101(1)(a).
A. Review
¶ 8 As an initial matter, we note that the parties dispute what, precisely, the district court ruled. The People argue the district court incorrectly found that the 1987 Executive Order had, in fact, expired at the conclusion of Governor Romer's term in office. Salgado, on the other hand, asserts the district court found that orders directing the Attorney General to prosecute cases under section 24-31-101(1)(a) must contain a "temporal and spatial framework" and, therefore, the broad grant of authority contained in the 1987 Executive Order could not support a prosecution so long after it was issued. We need not distinguish between these diverging interpretations of the district court's order because under either interpretation, the district court erred.
¶ 9 We first ask whether an order directing the Attorney General to prosecute certain cases pursuant to section 24-31-101(1)(a) necessarily expires-either when the issuing governor leaves office or at some undefined point thereafter-or whether it remains in effect until rescinded or supplanted. We must also consider whether the 1987 Executive Order was an improper exercise of legislative authority by Governor Romer, either when it was promulgated or at some point in the future.
¶ 10 Both questions require constitutional and statutory interpretation, presenting *832 questions of law we review de novo. Gessler v. Colo. Common Cause , 2014 CO 44, ¶ 7, 327 P.3d 232. We review an executive order under the same standard used to review a statute or ordinance. Stamm v. City & Cty. of Denver , 856 P.2d 54, 56 (Colo. App. 1993). "Thus, an executive order is presumed to be constitutional, and the burden is on a party attacking it to prove its unconstitutionality beyond a reasonable doubt." Id.
B. The 1987 Executive Order Did Not Expire
¶ 11 In its ruling, the district court made several references to the age of the 1987 Executive Order. It also expressed "concern" that the governor issuing the order had left office in January 1999. Finally, the district court stated that it "[took] no issue with the Executive Order and the effect of the order while Governor Romer was in office." Thus, though not explicitly stated, it appears that the district court concluded that the 1987 Executive Order expired at the end of Governor Romer's term.
¶ 12 As a general rule, executive orders validly issued pursuant to legislative or constitutional grants of authority remain in effect until revoked, modified, or superseded by later authority, and remain in effect beyond the expiration of the term of the governor who issued them. 81A C.J.S. States § 257, Westlaw (database updated Dec. 2018); see also McGinness v. Hunt , 57 Ariz. 70, 111 P.2d 65, 73-74 (1941) ; Baxter v. State , 134 Ga.App. 286, 214 S.E.2d 578, 582 (1975). Colorado's appellate courts have not had the occasion to address this issue. However, in at least one case, a division of this court has given present effect to an executive order that had been issued by a governor no longer in office at the time the executive order was invoked. See Kilpatrick v. Indus. Claim Appeals Office , 2015 COA 30, 356 P.3d 1008 (in a dispute arising in 2011, giving effect to a 2001 executive order). Thus, we are aware of no authority, and have been provided with none, to support the district court's tacit conclusion that executive orders expire along with the term of the issuing governor.
¶ 13 The district court also appeared to agree with the District Attorney's position, adopted by Salgado in this appeal, that there must be some "temporal and spatial framework" to a gubernatorial delegation of prosecutorial authority to the Attorney General. However, we are again aware of no authority dictating that such executive orders must expire after the governor who issued them leaves office. Nor are we aware of authority suggesting that such executive orders must expire after the lapse of some undefined period deemed sufficient by a court. Most importantly, such a rule finds no support in the language of section 24-31-101(1)(a).
¶ 14 Again, section 24-31-101(1)(a) requires the Attorney General to "appear for the state and prosecute and defend all actions and proceedings, civil and criminal, in which the state is a party or is interested when required to do so by the governor...." By its terms, it does not require the Governor, in directing the Attorney General, to restrict his or her directive to a geographic area, timeframe, or set of specific cases. The only requirement is that the state be "a party or ... interested." Id.
¶ 15 The supreme executive power is vested in the Governor. Colo. Const. art. IV, § 2. However, this power vests in the office, not the individual person inhabiting the office at any given time. An executive order, in other words, is the mandate of the office of the Governor, not the individual holding the title. Such a declaration of law no more expires at the end of the individual's term than a statute enacted by the Seventy-First General Assembly expired upon the opening of the first regular session of the Seventy-Second General Assembly in January 2019. This continuity of the law is "inherent and necessary to preservation of the stability and the integrity of our constitutional government." Baxter , 214 S.E.2d at 582.
¶ 16 In short, we agree with the great weight of historical treatment of executive orders across the nation. We hold that, absent some clear limitation on the effective lifespan of an executive order, or some limitation in the terms of the executive order itself, an executive order remains in effect until modified, rescinded, or superseded, and *833 it does not expire merely because the issuing governor is no longer in office.
C. The 1987 Executive Order Was Not a Legislative Act
¶ 17 The district court determined that "reliance on the 1987 order to confer authority would be an unconstitutional exercise of legislative power by the executive branch as applied to this case." Again, this conclusion appears to flow from the district court's belief that any executive order directing the Attorney General to prosecute cases must include a "temporal and spatial framework" restricting the Attorney General's prosecutorial authority. As we discussed above, there is no such requirement in the legislative grant of authority, and we may not amend the statute to impose one. See Estate of Brookoff v. Clark , 2018 CO 80, ¶¶ 5-6, 429 P.3d 835 (explaining that we are not free to carve out exceptions or limitations not provided by the terms of the statute).
¶ 18 Salgado argues that the district court correctly relied on two cases to find that a governor cannot issue a "blanket grant of authority" for the Attorney General to "prosecute a class of cases throughout the state for an indefinite period of time." We are not persuaded.
¶ 19 The first of these cases, People ex rel. Witcher v. District Court , reaffirmed that the authorization for the Attorney General to prosecute criminal cases did not conflict with a statute establishing the duties of district attorneys. 190 Colo. 483, 549 P.2d 778 (1976). The court in Witcher did not address the outer limitations of the Governor's authority to direct the Attorney General. Id. And while the executive order at issue in Witcher did pertain to an arguably more limited set of cases-" 'all actions and proceedings' stemming from disorders occurring within the Colorado state penitentiary"-nothing in the court's opinion suggested that the limited scope of the order was a prerequisite to finding it valid. Id. at 484, 549 P.2d at 779.
¶ 20 Likewise, in Colorado v. ASARCO, Inc. , 616 F.Supp. 822, 828 (D. Colo. 1985), a federal district court addressed whether a particular executive order directing the Attorney General to file claims concerning damages to natural resources at a particular site also "authorize[d] the Attorney General to proceed with claims for costs of removal and remedial action" on that site. The court was not asked to, and did not, decide precisely how an executive order must identify cases for the Attorney General to prosecute. Id.
¶ 21 Witcher does shed some light on Salgado's argument that the Governor can only authorize the Attorney General to act as a specially deputized district attorney, and not to prosecute in the Attorney General's own name. Significantly, the dispute in Witcher arose when the District Attorney asserted that he, and not the Attorney General, was the proper prosecutorial authority. People ex rel. Witcher v. Dist. Court , 190 Colo. 483, 484, 549 P.2d 778, 779 (1976). Clearly, then, the District Attorney had not deputized the Attorney General. Nevertheless, the Colorado Supreme Court held that the Governor's action properly authorized the Attorney General to assume the prosecutorial mantle in the designated types of cases. Id. at 485, 549 P.2d at 780. Salgado's argument, therefore, is at least unsupported if not directly contradicted by Witcher .
¶ 22 Other than on this point, Witcher and ASARCO offer little to no guidance in determining the breadth of a governor's power to direct the Attorney General to prosecute cases. Nor are they instructive on the issue of whether the 1987 Executive Order was an act of legislative, rather than executive, power.
¶ 23 Fortunately, little illumination on this point is needed beyond a straightforward view of the 1987 Executive Order itself. The order does not purport to create any new offenses or establish penalties for any act. It does not seek to announce any policy or agenda. Rather, it merely instructs an agency within the executive branch to prosecute certain offenses already established by the legislature. This action is nothing more than a mandate that a designated group of people undeniably under the aegis of the executive branch will be in charge of enforcing existing law. As such, it cannot be said that at the time it was promulgated, it was an act of legislation.
*834 ¶ 24 Even the district court acknowledged that the 1987 Executive Order was appropriate, and thus an act of executive rather than legislative power, at the time it was promulgated. We are unaware of any doctrine, and Salgado has cited none, that would suggest that an executive act becomes an exercise of legislative power merely because the executive act remains operative for a lengthy period of time.
¶ 25 Finally, we note that the district court placed weight on the fact that, during the course of the intervening three decades, the legislature "could have specifically acted but chose not to." This observation is inaccurate and, in any event, does not support the district court's conclusions.
¶ 26 First, the MFCU was created even before the 1987 Executive Order. The General Assembly has never acted to revise section 24-31-101 to exclude Medicaid fraud and patient abuse cases from the Attorney General's purview. Nor has it attempted to curtail the Governor's authority to direct the Attorney General to prosecute such cases. Rather than undercutting the continuing viability of the 1987 Executive Order, this lengthy period of inaction supports it.
¶ 27 More importantly, the General Assembly has not been silent in this area. Instead, the legislature has specifically appropriated funds in the annual budget for the Attorney General's programs implementing the Medicaid Fraud Control Program in every year since the 1987 Executive Order was issued. See, e.g. , Ch. 1, sec. 2, 1987 Colo. Sess. Laws 54; Ch. 424, sec. 2, 2018 Colo. Sess. Laws 2836.
III. Conclusion
¶ 28 In sum, the statute includes no requirement that the Governor direct the Attorney General to prosecute cases only within specific, restricted bounds. Further, the General Assembly has tacitly permitted and affirmatively funded the continued operation of the MFCU for thirty years. Therefore, we conclude that the 1987 Executive Order directs, and therefore properly authorizes, the Attorney General in his or her own capacity to prosecute cases of Medicaid fraud and patient abuse in Colorado.
¶ 29 The judgment is reversed, and the case is remanded for the district court to reinstate the charge against Salgado.
Hawthorne and Miller* , JJ., concur

The MFCU had originally been created several years earlier by Governor Romer's predecessor, Governor Richard Lamm. Through a series of executive orders, the MFCU had been housed in different governmental and quasi-governmental agencies, ultimately landing in the Attorney General's Office pursuant to Colorado Executive Order D 0034 81, Transferring the Colorado Medicaid Fraud Control Unit to, and Establishing Said Unit in, the Colorado Department of Law (Oct. 23, 1981). The 1987 Executive Order differed from its immediate predecessor in that the Attorney General was no longer directed to act "in cooperation with the District Attorneys of Colorado."

The Jefferson County District Attorney had previously declined to file charges because he felt there was insufficient evidence to prosecute Salgado.

Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5 (3), and § 24-51-1105, C.R.S. 2018.